UNITED STATES of America, by Ramsey CLARK, Attorney General, Plaintiff,

v.

BETHLEHEM STEEL CORPORATION, a corporation, Local 2601, United Steelworkers of America, Local 2602, United Steelworkers of America, Local 2603, United Steelworkers of America, Local 2604, United Steelworkers of America, Local 3144, United Steelworkers of America, and the United Steelworkers of America, Defendants.

Civ. 1967–432.

United States District Court,
W. D. New York.

April 13, 1970.

K. William O'Connor, Civil Rights Division, Dept. of Justice, Washington, D. C. (Louis M. Thrasher, Washington, D. C., of counsel), for plaintiff.

Cravath, Swaine & Moore, New York City (Thomas D. Barr, New York City, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N. Y., of counsel), for defendant Bethlehem Steel Corp.

Bredhoff, Gottesman & Cohen, Washington, D. C. (Michael Gottesman, Washington, D. C., of counsel), for defendant United Steel Workers of America.

Thomas E. Krug, Buffalo, N. Y., for defendant Local Unions Nos. 2601, 2602, 2603, 2604 and 3144.

JOHN O. HENDERSON, Chief Judge.

This case involves violations of the equal employment provisions (Title VII) of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). The United States charged the Bethlehem Steel Corporation and, in an amended complaint the United Steelworkers of America and local unions of the United Steelworkers, with engaging in a "pattern or practice" of racial discrimination in their employment practices at Bethlehem Steel Corporation's Lackawanna Plant (hereinafter "Plant").

Most of the facts were stipulated.* Bethlehem admitted discrimination against Negroes in most phases of its employment practice and much of the relief requested by the government was agreed to and entered as part of the pre-trial order.

Bethlehem Steel Corporation's Lackawanna Plant is its second largest steel plant—the fourth largest in the country. Its normal working force consists of about 18,000 people with an annual payroll of around 135 million (DC Ex. 1, p. 10).

### DISCRIMINATION IN GENERAL HIRING AND ASSIGNMENT PROCEDURES

The admitted activity of the company regarding its discriminatory employment practices creates a sorry image.

Until September 1967, the Plant did not uniformly apply objective standards and procedures for the hiring and assignment of new employees. Bethlehem has admitted, for example, that the Plant's employment office falsely raised the general aptitude test scores of some white applicants, hired some white applicants without testing, granted pref-

erential treatment to white applicants for summer employment and, in general, provided employment opportunities to white applicants which were not generally provided to Negro applicants. For example, as mentioned below, the Supervisor of Employment consistently preferred residents of Angola, an all-white suburb, for employment opportunity. The Plant also followed a practice of generally assigning Negroes to the hotter, dirtier and less desirable jobs and departments and not assigning Negroes to other jobs and departments to which white employees have been traditionally assigned. In those instances where Negroes were initially assigned by the personnel department to traditionally white departments, they were discriminatorily rejected by supervisory personnel in those departments. The Supervisor of Employment believed that Negroes could stand heat better than whites.

Further detailing of the admissions contained in the stipulations serves no useful purpose but the court finds as fact the facts as set forth in the stipulations of July 18, 1968 and September 23, 1968. The court will now turn to the specific policies of discrimination which were practiced at the Bethlehem Plant.

It has been admitted that the company discriminated in hiring and assignment of employees until October 1, 1967. Until that time, the employment office at the Plant, through the Supervisor of Employment and the clerk interviewers, had the power to reject applications for employment with almost absolute discretion. Moreover, it is admitted that prior to October 1, 1967, the Plant failed to implement fixed and reasonably objective standards and procedures for hires; the employment officers, by falsely raising aptitude test scores of some white applicants, failing to test some white

---

* One stipulation of facts was filed with the court on July 18, 1968, and hereinafter will be referred to as Stip. # 1. A second stipulation of facts was filed on September 23, 1968, and will be referred to hereinafter as Stip. # 2. This court's pre-trial order of September 24, 1968, found stipulation # 1, except ¶ 13 (b), (d) and (e) to which stipulations the unions did not acquiesce, as facts.

applicants and otherwise granting preferential treatment to white applicants, provided employment opportunities to white applicants not generally provided to Negro applicants.

Further admitted examples of this follow:

(a) Preferential treatments in new hiring and assignment was accorded by the Supervisor of Employment to residents of Angola and all white suburban areas near Lackawanna. This practice was known to the Office of Management's Representative who is responsible to Plant management who is, in turn, responsible to management at the corporate level.

In the summer of 1966, 26 Negroes out of 1100 summer employees were hired; in 1967, 12 out of 478.

Management and other supervisory personnel of the Plant compiled a "Golden List" designated "AU" (the chemical symbol for gold) which contained the names of a selected group of prospective summer employees who were given preferential treatment including assurance of a job, rapid processing and favorable job assignment. The employment applications of such persons were designated with the symbol "AU." No Negro has ever been on the "Golden List."

(b) The Plant followed a pattern or practice of discrimination in assignment of Negroes and whites to departments between July 2, 1965 and October 1, 1967, by assigning 20% of newly-hired whites and 50% of newly-hired Negroes to five departments of the 82 departments · in the Plant as follows: 404 (Brickmason-Labor Unit), 503 (Blast Furnace Sintering), 512 (Coke Oven), 520 (Blast Furnace) and 530 (Steelmaking). These five departments then comprised only 19% of total Plant hourly paid employees but are admittedly among the hotter and dirtier places of employment in the Plant. The assignment of Negroes to these five departments, it is admitted, was in part premised on the view of the employment office that Negroes could stand the heat

better than white employees (Stip. pp. 12–13).

(c) Departments which have been traditionally white have remained so because of the Plant's practice which continued to October 1, 1967, of not assigning Negroes to those departments or to the practice of some white supervisory personnel of rejecting Negroes when they were assigned to those departments (Stip. p. 15), prior to October 1, 1967.

The result of Bethlehem's racial assignment has been that Negroes have been involuntarily concentrated in only the following eleven of the Plant's 82 departments: Departments 404 (Brickmason Labor), 406 (Yard), 503 (Sintering Plant), 512 (Coke Ovens), 520 (Blast Furnaces), 530 (Steelmaking), 612 (44″–32″ Mills), 620 (Billet Yard), 631 (12″–10″–8″ Bar Mills), 660 (28″ Mill) and 662 (14″ Mill). As of October 21, 1967, these eleven departments contained 83.6% of all Negro employees at the Plant.

Since at least 1961, the union has been aware that most of the Negroes in the Plant were concentrated in the eleven departments and that this concentration resulted from Bethlehem's assignment policies. In short, all the defendants knew of the racially discriminatory assignment of Negroes in the Plant.

In addition to the assignment of most Negroes to the eleven departments, Bethlehem excluded Negroes from the higher paying and cleaner departments of the electrical and mechanical divisions. Bethlehem stipulated that "until September 1967 the Plant pursued a pattern or practice of excluding qualified Negroes from the Electrical Division Departments and had on occasion hired and assigned whites to those departments without regard to their qualifications. As of December 8, 1967, the Division employed 1,364 persons, of whom only eleven were Negro." Similarly, Bethlehem has admitted that "until September 1967, the Plant pursued a pattern or practice of excluding qualified Negroes from certain Mechanical Division

Departments. As of December 8, 1967, the Division employed 3,690 persons, of whom 341 were Negro. Two hundred forty-eight of the 341 Negroes were in a non-mechanical laborer unit in the Brickmason Department, the only Mechanical Department which has a large non-mechanical labor unit." The average pay of employees in the Laborer unit of the Brickmason Department is significantly lower than the average pay for craft workers in the same unit.

The union has been aware, since the effective date of Title VII of the Civil Rights Act of 1964, of the pattern of racial assignments to the various departments of the Lackawanna Plant.

## SELECTION OF SUPERVISORY EMPLOYEES

Until September 1967, the Plant admitted pursuing a practice of generally excluding Negroes from supervisory positions by basing promotion on essentially subjective determinations. Additionally, in some instances the Plant transferred white employees from traditionally white departments into predominantly Negro departments to assume supervisory positions. The practice has restricted the number of Negro supervisory personnel. In short, defendant Bethlehem engaged in racially discriminatory conduct with regard to hiring, assignment and promotion both prior to and after the effective date of Title VII. These discriminatory employment practices continued up to September 1967 when the United States began its inquiry into Bethlehem's practices.

Nothing could be clearer than that Bethlehem, as it admitted, has engaged in an unlawful pattern and practice of racial discrimination in employment in violation of Title VII of the Civil Rights Act of 1964.

## RELIEF REQUESTED

The Attorney General asks this court to grant relief in three respects as follows:

(a) the Attorney General seeks to obtain a right of transfer for any Negro in the eleven departments who was or may have been discriminatorily assigned prior to October 1, 1967. Such a Negro would be entitled to first priority to transfer to any vacancy in any of the other 63 departments with a guarantee that the pay he would receive in his new job would be at least equal to his average hourly earnings (including overtime and incentive) in his former job. If his new department did not have any job which paid so well, he would be paid at the rate of the top job in his new department. In addition, he would have superseniority, that is, he would be entitled to use his continuous Plant service, not unit seniority, to bid for vacancies in his new unit;

(b) the Attorney General seeks to suspend for five years the application of Appendix 10 of the currently effective Master Agreement which provides that craft apprenticeship vacancies shall be filled on the basis of relative seniority first from within the seniority unit, then from within the pool area including the seniority unit, then from within the Plant and lastly from among new hires. Instead, the Attorney General would require the company to consider Negro applicants from anywhere in the Plant or from off the street for apprenticeship vacancies; and

(c) the Attorney General seeks special relief with respect to the Coke Ovens Department, specifically to provide a right of transfer for any Negro, hired prior to October 1, 1967, and assigned to the Battery or Coal Handling units, to fill any vacancy in one of the other units with rate retention and superseniority.

In order to determine whether such relief is warranted, the facts surrounding the present transfer system must be considered. Consideration should also be given to the specific facts regarding the Coke Ovens Department and the Apprentice program.

## THE SENIORITY STRUCTURE OF THE PLANT

There are 82 departments at the Plant, each of which has a special function in

the production of steel products, maintenance of facilities or servicing of the production departments of the Plant. Of the 82 departments, eight have no bargaining-unit hourly paid employees. The 74 remaining departments, the "production" departments, vary to a large degree in size, number of seniority units, function, worker skill required, rate of pay and type of hazard encountered. Although the departments are geographically located close to one another, their functions interrelate only vertically. They are disparate as working entities and as to processes utilized and products produced. Except as otherwise specifically designated herein, the court's discussion will be confined to the 74 production departments.

For purposes of promotion, job assignment and pay, there are 81 seniority units, some of which coincide with the departmental organization of the Plant. In certain departments the operations performed are so diverse that more than one seniority unit has been established, as in the Coke Ovens Department which is made up of four quite different seniority units and a Labor Gang. Within the seniority units are functionally structured lines of progression along which a worker may progress, or in slack periods be required to regress, from job to job. There are 285 lines of progression in the Plant. The general establishment of seniority units and lines of progression preceded the formation of the union, operating as a matter of custom and usage between the company and the employees. When the union came on the scene, it accepted the existing structure. Every functionally integrated steel plant in the United States has a multiple-unit seniority system.

After the initial assignment of an employee by the company to a particular department, his further assignment, layoff and transfer rights are based on a system of seniority detailed herein. This seniority system is in use throughout the entire basic steel industry in the United States and is not peculiar to, and was not designed solely for, this Plant or even this company. It is, therefore, plain that any substantial court-ordered revision or modification of the seniority system now in operation at the Plant would have significant implications for the entire basic steel industry.

The Master Agreement is negotiated between representatives of the International Union and representatives of the basic steel industry. It is applied or adapted in accordance with its terms by the company and the Locals to the practices, customs and usages at the Plant, as at each of the other basic steel companies and plants throughout the country. Certain specific responsibilities are reserved in the Master Agreement to the Locals. The principles of the seniority system, as negotiated between the company and the International Union to apply to the various plants of the company, are embodied in the present Master Agreement entered into by them under date of August 1, 1968, and prior thereto in earlier Master Agreements.

The seniority system itself, as embodied in the Master Agreement and in implementing agreements relating to the Plant, was not and is not designed or motivated by racial discrimination and does not result in racial discrimination, and the government does not contend otherwise.

Article X, Section 8, of the April 6, 1962, Master Agreement required the establishment of "agreed upon" or "pool" areas. Each pool was to embrace at least one major operating unit within which all employees' rights in respect of layoff and recall from the involved plant were to be determined in accordance with continuous plant service. The stated purpose for establishing pool areas was to provide greater overall protection from layoff for longer-service employees.

At the Plant 36 pool areas, each comprised of one or more of the existing seniority units, were established by agreement between the union and the company. Jobs classified as "pool jobs" in any given pool area are available on

the basis of continuous Plant service to any employee in a seniority unit in the particular pool area with two or more years of continuous Plant service who by reason of lack of seniority has been demoted within and laid off from his seniority unit because of lack of work. His layoff and recall rights in the pool are thereafter determined in accordance with continuous Plant service. The composition of the pool areas has been, since 1962, governed by Local Seniority Agreements implementing the Master Agreement. Appendices to the Local Seniority Agreements list the pool areas at the Plant and the "pool jobs" within each area, which are effective during the period of each such agreement. Under the agreements at the Plant, all of the jobs in job classes 1, 2 and 3 and jobs constituting two-thirds of the worker population in job class 4 are designated "pool jobs." Those lower-rated jobs were chosen because few of the skills developed by experience in the line of progression are necessary for their performance.

Jobs in the steel industry have been classified for pay purposes through industry-wide negotiations with the International Union. Pursuant to an order of the National War Labor Board dated November 24, 1944, the steel industry, International Union and management, undertook to classify each job in each plant and standardize the wages for each. The results of those efforts, as updated, are now embodied in a job Description and Classification Manual most recently published under date of January 1, 1963. Twelve specific criteria are applied to classify each job:

(1) Pre-Employment Training;

(2) Employment Training and Experience;

(3) Mental Skill;

(4) Manual Skill;

(5) Responsibility for Materials;

(6) Responsibility for Tools and Equipment;

(7) Responsibility for Operations;

(8) Responsibility for Safety of Others;

(9) Mental Effort;

(10) Physical Effort;

(11) Surroundings; and

(12) Hazards.

## TRANSFER PROVISIONS

Prior to 1962, the agreements between the company and the union contained no provision giving employees the right to transfer from one department to another within the Plant. This was also true of most of the other plants in the steel industry. As a practical matter, therefore, Negroes assigned to the eleven departments had no way, prior to 1962, to escape those departments and enter other departments which might have offered better long-term financial opportunities. This was equally true, of course, for the whites who were assigned to the eleven departments, and for the whites who were assigned to the many other departments affording financial opportunities inferior to the eleven departments—they, too, had no way to escape from the department to which they were assigned. The union has sought to obtain transfer rights in the steel industry at least since 1954, but it was unable to win such rights in negotiations until 1962.

In 1962, the union and the eleven steel companies bargaining together as the Steel Companies' Coordinating Committee agreed to adopt an industry-wide provision which would enable employees to transfer from one department in a plant to another. These transfer rights were broadened and strengthened in the 1965 and 1968 agreements. One of the factors which prompted the union to seek transfer rights was its awareness that in many steel plants Negroes had been assigned predominantly only to certain departments, and that only through a transfer procedure could the effects of this assignment pattern be overcome.

Under the 1962 agreements, "agreed-upon areas" (sometimes called "pool areas") were to be established in each

plant. A vacancy not filled from within a seniority unit would be made available to the most senior qualified employee working anywhere within the "agreed-upon area" who sought the vacancy. This provision entitled employees to transfer from one department to another within the "agreed-upon area." It did not, however, entitle employees to transfer to departments outside their "agreed-upon area."

The 1965 agreement broadened transfer rights so that they became plantwide. Under the 1965 agreement, a vacancy not filled from within a seniority unit would be made available to employees seeking transfer in accordance with the following system of priorities:

First, to the most senior qualified employee working within the "agreed-upon area" who sought the vacancy (under the Bethlehem agreement, this is known as a "Section 12(a)" transfer);

Second, if not filled from within the "agreed-upon area," to the most senior qualified employee working anywhere in the Plant who sought the vacancy (under the Bethlehem agreement, this is known as a "Section 12(b)" transfer).

Under the 1965 agreement, employees were entitled to bid for Section 12(a) transfers after they worked in the Plant for six months, and for Section 12(b) transfers after they had worked in the Plant for two years. The Steel Companies Coordinating Committee insisted upon the two-year requirement in the fear that new employees would seek repeated transfers before they grew accustomed to their initial assignments. Under both the 1962 and 1965 agreements, employees who transferred from one department to another received the pay of the job to which they transferred, and were governed by the following seniority rules:

(a) For purposes of layoff and recall, their plant-wide seniority governed.

(b) For purposes of promotion and demotion, their unit or departmental seniority (i. e., seniority beginning on the date the transfer was effected) governed.

This absence of rate retention and lack of seniority carryover for promotion and demotion purposes is common to every functionally integrated plant in the steel industry.

During the three-year term of the 1965 agreement, there were a total of 306 applications for transfer under Sections 12(a) and (b) at the Lackawanna Plant, filed by 267 employees (some employees applied for more than one transfer). Of this total, 47 applications were filed by 43 Negro employees.

Many of those, white and Negro, who applied for and accepted transfers did so despite the fact that they suffered a short-term cut in pay (because their new job paid less than the old) and/or sacrificed substantial seniority for promotion and demotion purposes on account of the transfers. At least 25 transferees (21 whites and 4 Negroes) suffered an immediate cut in pay by reason of the transfer. Sixty-two of the transferees (57 whites and 5 Negroes) had seven or more years of service (some had as many as 19 or 20 years), yet they transferred and entered the new department without seniority carryover for promotion and downgrading purposes. This experience is significant, for it demonstrates that the absence of rate retention and seniority carryover is not a complete deterrent to employees' transferring. Employees are willing to take short-term pay cuts, and to give up their former unit seniority, when sufficiently attractive long-term opportunities arise in other departments.

Furthermore, it appears that the temporary economic set-back suffered by a transferring employee would be of quite short duration. Evidence was introduced concerning the largest department in the Plant, Department 670 (Strip Mill). This department has more than 2000 jobs, and would be one of the principal recipients of transferees. In that department, employees entering in October, 1967, and beginning to accrue

promotional seniority at that point *averaged* fifty cents per hour more than the pay of the entry level job during their first ten months. Since most of them started at the entry level job, this means that at the end of the ten month period they were enjoying earnings substantially greater than fifty cents per hour above the entry level job. During that ten month period, many of these new employees rose to high-paying positions. This specific example is corroborated by plant-wide statistics indicating that employees with less than two years service average nearly 75 cents per hour above the lowest rate in the Plant, and employees with two to five years of service average nearly $1.35 per hour above the lowest rate in the Plant. It is thus apparent that an employee who transferred without the special remedies sought by the government nevertheless would progress at a rapid rate to relatively high-paying jobs in his new department.

## THE EFFECT THE PRESENT SYSTEM OF TRANSFER AND SENIORITY HAS ON PAST PRACTICES OF DISCRIMINATION AT THE BETHLEHEM PLANT

There are 36 pools at Bethlehem, Lackawanna. One entire union local, Local 2602, is composed of 22 departments which constitute separate pools. All of the apprenticeable crafts are located within those departments. All but one of those departments (Department 404) are almost entirely white as the result of the discriminatory assignment and apprenticeship policies followed by Bethlehem. Therefore, the "intra-pool" transfer provisions mentioned previously were meaningless as to those units.

Thus, the proliferation of pools discriminatorily reduces the freedom of movement of Negro employees because under the Master Agreement intra-pool

transfers have priority over transfer by persons into a different pool.[1]

Three of the major production departments, Coke Ovens—512; Blast Furnace —520; and Steelmaking—530 (to which Negroes were historically discriminatorily assigned regardless of their qualifications) have included within each of their respective pools the all-white Electrical and almost entirely all-white Mechanical Departments which support those units. These predominantly Negro units provide almost all of the pool jobs in each of the three pools and, therefore, provide job security to the white units without receiving any job security from the white units in return.

In one pool in which the major production unit is almost entirely white, the Strip-Mill, Department 670, the all-white Electrical and Mechanical units which support it (and which would gain job security at the expense of the Strip-Mill) are not in the same pool.

Under Article X, Section 6, of the 1965 Agreement, an employee did not acquire any seniority until the expiration of six months, after which the length of his continuous service was computed from the date of his original employment. Consequently, a 12(a) transfer could be had only after he had six months of service in the Plant. The 1968 Agreement still requires six months of Plant continuous service for eligibility of transfer under Section 12(a). In effecting a transfer under 12(a), the transferring employee had to give up basically the same accrued rights described above in the discussion of 12(b) transfers.

In other words, an employee who chooses to exercise either of these transfer rights must forfeit all of the benefits of seniority which he had accrued in his pre-transfer position, such as pay rate, promotion opportunities, protection against demotion, job selection, and enter

---

1. Art. X, Section 12(b) of the 1965 Master Agreement (G–8) required an employee to have two years plant continuous service before he could transfer between pool areas. The 1968 Master Agreement (G–8, Art. X, Section 12(b)) reduced that period to one year.

the new unit as a new man, generally going to the entry level job.

The court finds as fact that the transfer and seniority system negotiated in the 1962, 1965 and 1968 Master Agreements by the company and union, operates (as described above) in such a way as to tend to lock an employee into the department to which he has been assigned. This lock-in effect becomes stronger as an employee's length of service increases in a department. This means that the longer a Negro has worked in the hot and dirty department to which he was admittedly discriminatorily assigned, the more he has to lose by transfer.

## DISCRIMINATION IN THE APPRENTICESHIP PROGRAM

Since 1946, Bethlehem has operated an apprenticeship training program to train employees in thirteen highly paid craft job areas. Until August 1, 1968, admission to the apprenticeship program was under the exclusive control of Bethlehem. From its inception in 1946 until September 1, 1967, a total of 567 craftsmen were graduated from this apprenticeship program, only six of whom were Negro. All of the Negroes were trained as bricklayers.

The Plant admittedly gave preferential consideration to white apprenticeship applicants, to the detriment of Negroes. Between July 2, 1965 and September 1, 1967, at least eleven Negro apprentice applicants were rejected on the basis of deficiencies in one or more of the announced qualifications for the program while during the same period at least 25 whites were accepted for training despite similar deficiencies.

A number of Negroes applying for the program were discriminated against in various other respects, and a total of at least 40 Negroes who qualified for the apprenticeship program have been discriminatorily rejected by the Plant since July 2, 1965.

As of September 6, 1968, there were a total of 126 apprentices in the Plant's apprenticeship training program. Of that number, which included ten Negroes, 33 had been hired directly "off the street" into the program rather than having been assigned to the program from other work areas at the Plant. (Ex. G–26). Bethlehem admitted and the court found in its pre-trial order that the hiring and assignment practices in the apprenticeship program were racially discriminatory.

On the basis of this admission of discrimination, this court entered an agreed pre-trial order containing *inter alia* prospective relief provisions relating to the apprenticeship program. Under the order, Bethlehem is required to take certain enumerated steps to insure equal opportunity to Negroes in entering the apprenticeship program in the future. Since the union had not been involved with the apprenticeship program as it had existed theretofore, the union was specifically exempted from the relief provisions of the pre-trial order dealing with the apprenticeship program.

During a pre-trial conference, the court was advised by counsel for the government that on August 1, 1968, as a result of negotiations between Bethlehem and the union, selection to the apprenticeship program for the first time was removed from the exclusive control of the Plant by virtue of an agreement embodied in Appendix 10 of the 1968 contract to use the seniority system in filling apprenticeship openings. At the time of trial, union officials testified that this agreement means that the selection of apprentices will now be in the following order of priority:

1. From within the department in which the apprenticeship is located;

2. From among the Plant employees on a plant-wide basis; and

3. New employees from the outside.

Although the new system of selection has much to recommend it over the former arbitrary system of selection given

non-discriminatory assignment to craft departments, the court finds that this system cannot be superimposed on the set of facts presently existing at the Lackawanna Plant. The inevitable effect of this agreement, because of the admitted racial composition of the departments in which the apprenticeable jobs are found, is and will be to give a preference to white persons in all of the apprenticeship crafts except one, *viz.*, Department 404 (Brickmason). This preference is a direct and necessary result of practices which this court has already found to be discriminatory and in violation of the 1964 Civil Rights Act. There is no justification for Bethlehem and the union to erect a new system which under these facts necessarily perpetuates a prior discriminatory situation. The new system of apprenticeship, since it is founded on a discriminatorily determined departmental situation, tends to extend and continue the past discrimination in violation of the Civil Rights Act of 1964 and should be altered.

On December 8, 1967, there were only 31 Negroes among the 1908 employees in the 12 departments, other than Department 404, to which apprentices are assigned. It is highly relevant to note that this situation is a direct result of discriminatory assignments carried out before and *after* the effective date of Title VII.

█ Since the new system makes an employment opportunity (entry into the apprenticeship program) contingent upon a status which Negroes were unlawfully prevented from achieving, that is, employment in one of the twelve apprenticeable departments in question, that system is also discriminatory and violative of Section 707(a) of the 1964 Civil Rights Act (42 U.S.C. § 2000e–6(a)).

The union attempts to justify the use of the selection procedure under Appendix 10 on the basis of the fact that it is attempting to establish the same procedure in the steel industry as a whole. From this, it argues that the applica-

tion of Appendix 10 to the apprenticeship program was not selected to discriminate against Negroes.

However, whether or not application of the Appendix 10 selection procedure is a nation-wide union goal, and whether or not it would produce substantial Negro participation under a fact situation existing at a different steel plant, is immaterial and irrelevant to the instant situation, where company assignment practices prior to and following the effective date of Title VII resulted in exclusively or predominantly white departments from which apprenticeships under Appendix 10 would be filled on a priority basis. When the natural consequences of conduct in the given situation result in the denial of equal employment opportunities for Negroes, the purported reasons are immaterial and the natural consequences must be held to have been intended.

However, Department 404 (Brickmason) has not been the exclusive domain of white employees as have the other twelve departments with apprenticeable jobs. For example, Department 404 had 243 Negroes out of a total of 503 employees as of December 9, 1967. This large number of Negroes resulted from the Plant's practice until September 1967 of assigning Negroes to the laborer or helper jobs which are among the hotter and dirtier jobs in the Plant. Testimony at trial revealed that brickmason laborers spend most of their time in "holes and sewers." Since Negroes have not been excluded from Department 404, they have not been denied the status upon which eligibility for apprenticeship selection under Appendix 10 would depend. The government concedes that this is the case, and the court finds that Appendix 10 may be applied to Department 404 without violating Title VII.

### COKE OVENS DEPARTMENT 512

The Coke Ovens Department is a production unit that produces coke for the rest of the steel plant to be used in making steel. The basic production unit within the Coke Ovens is the Battery

Unit which consists of a series of ovens which reduce coal to coke. Because of the working conditions on the Batteries, the Coke Ovens Department was considered to be one of the hottest and dirtiest places in the Plant to work and for this reason, prior to September 1967, the Plant pursued a pattern or practice of assigning Negroes to the Coke Ovens Department regardless of their qualifications for other positions.

Department 512 has four separate seniority units. The Battery and Coal Handling Units, which have the lowest maximum pay rates in the department, job class 11, are 79% and 48% Negro, respectively; the By-Products and Heating Units, which have the highest top job grades in the department (job classes 15 and 18, respectively) are 15% and 26% Negro, respectively. One of the causes of the racial composition of these units was the racial discriminatory assignment of Negroes to the department. However, the prime cause of the disproportionate number of Negroes in the Battery and Coal Handling Units was the discriminatory assignment of Negroes by the Coke Ovens supervision, regardless of their qualifications to those units because those units contain the hottest and dirtiest jobs. To prevent Negroes from exercising their seniority rights to enter into the predominantly white units in Department 512, the Coke Ovens management and Local 2601 superimposed a unit seniority system over the Coke Ovens units and locked the Negro employees in the Battery and Coal Handling Units by enforcing a no transfer provision.

Prior to 1950, Coke Ovens management had complete control over assignments to the units within the Coke Ovens. Such assignments were made on the basis of race and Negroes were generally assigned to the Batteries and to a lesser degree to the Coal Handling Units, whereas whites were assigned to the Electrical, Mechanical, By-Products and Heating Units in the Coke Ovens.

In 1950, the first written Coke Ovens Department seniority agreement was negotiated by Bethlehem and Local 2601. This agreement established these units as separate seniority units in the Coke Ovens. Under this agreement, vacancies in the units were to be filled from the Coke Ovens labor gang on the basis of departmental seniority. However, the agreement did not provide that replacements could be obtained *only* from the labor gang. It was the mutual understanding between the Coke Ovens management and Local 2601 that replacements to fill vacancies in the units would also be obtained by allowing transfers from the various units in the Coke Ovens to fill the vacancies. This mutual understanding provided that the transferee would enter the entry-level position of the unit into which he desired to transfer and, consequently, he would lose his pay rate and enter the new unit at the entry-level job.

In 1952, new personnel moved into the top supervisory positions of the Coke Ovens. The new supervision imposed a prohibition against transfer between the seniority units in the Coke Ovens solely for the purpose of preventing Negroes from transferring into the white Coke Oven units.

Local 2601 acquiesced in the new prohibition against transfers. The newly elected president of Local 2601 in 1954 did not even become aware of the Coke Ovens seniority system until 1956. In 1956, Local 2601 filed a grievance requesting that the seniority system be altered so as to allow transfers, thus conceding that the seniority system prohibited transfers. Local 2601 withdrew this grievance before it was considered by the arbitrator, after reading Bethlehem's brief. The Coke Ovens Department membership of Local 2601 in 1958 and 1963 never voted to retain any prohibition against transfers. The only vote on the issue of transfer was recorded in the grievance filed in 1956 in which the Coke Ovens employees unanimously voted in favor of transfer. How-

ever, even if the membership had voted to retain a no-transfer provision, Local 2601 would have still had the duty to negotiate a system that would alleviate the discriminatory assignment patterns.

In 1962, the company and union negotiated transfer rights which gave employees the right to transfer between seniority units into vacant positions. This right to transfer between seniority units was limited to seniority units which were encompassed within the same pool for lay-off and recall purposes.

In 1965 and 1968, the transfer rights between seniority units in the same pool areas were renegotiated and remained in effect. In spite of the 1950 seniority agreement pertaining to the Coke Ovens, Local 2601 interpreted the transfer of right provision in the 1962, 1965 and 1968 contracts to provide no transfer of right between the seniority units in the Coke Ovens Department, even though these units were in the same department and *a fortiori* in the same pool area. Local 2601 affirmatively enforced this interpretation and both before *and after* 1965, the effective date of Title VII, instructed its membership that there was no right to transfer and took no action to enforce Negro employees' right to transfer within the Coke Ovens when such rights were denied by the Coke Ovens Management. Bethlehem continued to prohibit transfers until August of 1968. However, Local 2601 continued to contend that the seniority system prohibited transfers until December of 1968 when the trial of this case was almost completed.

The prohibition against transfers instituted in 1952, was instituted for the purpose of discriminating against Negroes. Local 2601's acquiescence therein established that prohibition as part and parcel of the Coke Ovens seniority system. The Coke Ovens unit seniority system and prohibition against transfer had the purpose and effect of segregating Negroes within the Coke Ovens and denying them equal opportunity of employment in the Coke Ovens.

The Master Agreements provide that new employees have no seniority rights for the first 30 days of their employment. One of the methods of effecting the racial assignment to the different units in the Coke Ovens Department was to manipulate the Coke Ovens Department seniority system by assigning Negroes out of the labor gang after they had been in the labor gang anywhere from three days to two weeks and therefore had not yet accrued enough service to have any seniority rights, primarily to the Batteries Unit and also to the Coal Handling Unit. Company records indicate that Negro employees have complained about such practices since 1956. These Negro employees were told only that they were to work on the Batteries and were sometimes not told whether or not their assignments were permanent, but were always informed that transfers between units were not allowed.

Although there is credible evidence on the record to indicate that in *some* instances Negroes preferred assignment to Batteries and Coal Handling because initial rates of pay are higher and employment tends to be steady in those units, a conclusion that this factor completely explains the present composition of the units and that their racial makeup at present is a result of non-discriminatory assignment of employees to the various units would be against the weight of evidence and would ignore the facts disclosed by the evidence.

While the company's Coke Ovens Department seniority records indicate that there have been no permanent assignments to the Batteries Unit since 1965, Negroes with Coke Ovens seniority dates since 1965 are working on the Batteries. While the company maintains that these people are really in the labor gang, the records of unit assignments maintained in the Coke Ovens indicate that several of these Negro employees, who have no record of any permanent assignment date to the Batteries, are recorded as filling

the entry-level jobs in the Batteries Unit on a permanent basis. Seventy-three of these Negroes working on the Battery, hired since 1965, have more departmental seniority than do some white employees working in the By-Products and Heating Units.

The seniority lists prepared for each unit in the Coke Ovens in December of 1967 (Ex., G–52) reflect the following:

| Unit | Total Employees | Total White | Total Negroes | Other Minorities |
|---|---|---|---|---|
| Battery | 350 | 44 | 277 | 29 |
| Coal Handling | 79 | 30 | 39 | 10 |
| By-Products | 53 | 43 | 8 | 2 |
| Heating | 57 | 42 | 15 | 0 |
| Labor Gang | 18 | 5 | 12 | 1 |
| | 557 | 164 | 351 | 42 |

These figures indicate that of all the Negroes working in the Coke Ovens Department, 79% are working in the Battery Unit and 90% are working either in the Battery or in Coal Handling Units. At the same time, only 27% of the whites working in the Coke Ovens Department were working in the Battery Unit and only 45% of the whites were working in either the Battery or Coal Handling Units.

The seniority records of Negroes who worked in the Battery Unit from 1964 through 1965 and for whom dates of permanent assignment to that unit are indicated reflect that the average Negro working in that unit was permanently assigned to the Battery within 3.4 days after he was assigned to the Coke Ovens Department.

Complementing this racial assignment has been the practice of excluding Negroes from the By-Products laborer job both before and after July 2, 1965. Company records indicate that no Negroes presently working in the Coke Ovens Department had ever worked in the position of By-Products laborer. On the other hand, of the 53 employees working in the By-Products Unit, 22, all of them white, had entered the unit in the position of By-Products laborer. Negroes have been dissuaded from accepting the By-Products laborer job by being informed that they do not have the qualifications to operate the next By-Products job above the laborer job and therefore were told that they could not progress above the position of laborer in the By-Products Unit.

■ The officers of Local 2601 have long been aware of such practices. This has been established by the fact that various Negro stewards have complained to the white officers of Local 2601 about such practices. The notice of such discriminatory practices to Local 2601 placed upon the local the duty to take whatever steps were lawful to alleviate the discrimination and the effects of such discrimination upon its Negro membership. However, Local 2601 filed only one grievance that might allege racial discrimination until after the investigation of this case by the Department of Justice.

Departments 417 and 427 are the Mechanical and Electrical Units, respectively, that prior to 1952 were units within the Coke Ovens Department. Their racial composition at that time was white. In 1952 they were made separate departments. Prior to their separation from the Coke Ovens Department, Coke Ovens employees were allowed to bid into those units from the Coke Ovens labor gang. After the separation of those units from the Coke Ovens Department, employees in the predominantly Negro

Coke Ovens Department could no longer bid into those units.

From 1952 until 1962 there was no transfer of right provisions that would allow transfers between the Coke Ovens Department and the Electrical and Mechanical Departments. Because of the separation of these units from the Coke Ovens and because of the continuing racially discriminatory assignment of Negroes to the Coke Ovens and white employees to the Electrical and Mechanical Departments by Bethlehem, the Electrical and Mechanical Departments remained almost entirely white. While the 1962 and 1965 Master Agreements provided for a transfer of right between units in pool # 1, Bethlehem prevented Negroes from transferring into the Mechanical and Electrical Units by the discriminatory application of tests.

The 1962, 1965 and 1968 Master Agreements negotiated by the union and Bethlehem provided for the creation of pools for the stated purpose of extending layoff and recall protection to senior employees. The actual composition of the pools in terms of which departments were to be joined together to create such pools and which jobs in those departments were to be included in pools as "pool jobs" were left up to the local unions and Bethlehem. Bethlehem and Local 2601 agreed to place Department 417 (Mechanical), Department 427 (Electrical), and the Coke Ovens Department together to create pool # 1. In a layoff situation, senior employees in the departments within a pool can move out of their departments into other departments and occupy pool jobs. The Mechanical Unit had only two jobs that are classified low enough to be included as pool jobs. The Electrical Unit had no jobs that were low enough to be pool jobs. Therefore, virtually all of the pool jobs in pool # 1 were contributed by the Coke Ovens Department. As a result of this composition, employees in the all-white Electrical and Mechanical Units can bump Coke Oven Department employees out of pool level jobs in the Coke Ovens Department in a layoff situation. The reverse is not true. Therefore, the employees of the all-white Mechanical and Electrical Units were afforded substantially more layoff and recall protection than were the employees of the predominantly Negro Coke Ovens Department.

The steps taken independently or in concert by Bethlehem and Local 2601 from 1950 until 1968, as outlined above, have resulted in the denial to Negro employees of the Coke Ovens Department of employment opportunities equal to their white counterparts. These steps were an extension of the discriminatory practices admitted by Bethlehem and found as fact by this court. It is clear that they were undertaken with the intent to discriminate against Negroes. To the extent that the defendants have had to observe the results of these steps, their failure to take corrective action and the pervasive discrimination practiced by Bethlehem throughout the rest of the Plant give ample bases to infer such intent.

■ All of these steps, independently and collectively, deprived and continue to deprive the Coke Ovens Negro employees of equal employment opportunities in violation of Title VII, 42 U.S.C. § 2000e et seq. Adequate relief for the Coke Ovens requires only that persons in the Coal Handling and Batteries Units, within the defined class as of the date of the court's order, should be offered the first opportunities to transfer to vacancies in the By-Products and Heating Units based upon their Coke Ovens Department seniority. These transferees would take the entry level job in those units if they should elect to transfer. The discrimination practiced in the past within the Coke Ovens Department requires that this relief be granted.

■ The findings of fact as outlined above have been reached by examining both the proof on trial and the stipulations filed with the court. Full consideration has been given to pre-Act conduct as revealed by the stipulations and the proof in spite of the protests of

the defendant corporation. It seems to the court that consideration of pre-Act conduct serves to illuminate the purpose and effects of present policies, especially where policies which appear to be racially neutral are claimed to be part of a pattern or practice of racial discrimination. Moreover, where the Act is violated, racially neutral practices may be prohibited or changed because they build upon a foundation of pre-Act discrimination and tend to have present discriminatory effects. Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir. 1970); United States v. Sheet Metal Workers Int. Ass'n, Local U. 36, 416 F.2d 123 (8th Cir. 1969), reversing, 280 F.Supp. 719 (E.D. Mo.1968); United States v. Local 189, United Papermakers and Paperworkers, 301 F.Supp. 906 (E.D.La.1969), aff'd 416 F.2d 980 (5th Cir. 1969); United States by Clark v. H. K. Porter Co., 296 F.Supp. 40 (N.D.Ala.1968); Dobbins v. Local 212 Int. Bro. of Elec. Wkrs., 292 F.Supp. 413 (S.D.Ohio 1968); Vogler v. McCarty, Inc., 294 F.Supp. 368 (E.D.La. 1968), aff'd sub nom., Local 53 of Intern. Ass'n of Heat and Frost Insulation and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va. 1968). Post-Act conduct cannot be properly evaluated in a vacuum. A full understanding of the nature and import of post-Act conduct may only be reached after considering the circumstances in which it takes place. Additionally, allegations that there is a "pattern or practice of discrimination" would be difficult to prove without reference to the practices of the past. In short, the prior acts of the defendants regarding employment practices are relevant and material in determining whether present practices are illegal or tend to perpetuate past discriminatory practices.

■ The Attorney General in this case has presented considerable statistical evidence in support of the allegations contained in the complaint. For example, certain statistics concern the percentage of Negroes in departments or units of the Bethlehem Plant on specific dates, and in some cases the statistics show the complete absence of Negroes in some departments of the plant. Statistical evidence is, of course, subject to various inferences, susceptible to many interpretations, and must always be viewed with caution and weighed with great care. Indeed, the disparate conclusions which have been urged on this court by the opposing parties, using the same statistical raw material, demonstrate the caution that must be used in drawing factual conclusions from statistics. But the difficulties inherent in the process should not render the use of such statistics improper. Probabilities guide men in their everyday affairs. Evidence of statistical probability may likewise be considered by a finder of fact in determining the questions presented. This was recognized by the Eighth Circuit Court of Appeals in United States v. Sheet Metal Workers Int. Ass'n, Local U. 36, *supra,* where the court stated: "The Act, in our view, permits the use of evidence of statistical probability to infer the existence of a pattern or practice of discrimination." 416 F.2d 123 at 127 n. 7. This court is of the opinion that in some cases the statistics themselves might raise such a compelling inference in the absence of any contrary explanation as to make out a prima facie case of discriminatory patterns or practices. This case, however, is not one of them. The admissions contained in the stipulations considered together with the statistical evidence and the testimony on trial comprise such overwhelming proof of discrimination that it warrants some relief by decree of this court for, as stated by Circuit Judge Wisdom, "When an employer adopts a system that necessarily carries forward the incidents of discrimination into the present, his practice constitutes on-going discrimination, unless the incidents are limited to those that safety and efficiency require." Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 at 994 (5th Cir. 1969). The court there noted that the Civil Rights Act "operates only prospectively," 416 F.2d 980 at

987, but too much emphasis on the prospective nature of the statute serves only to becloud the fact that seniority systems which perpetuate past discriminatory practices may be altered by decree when there has been a violation of the statute after its effective date. See, e. g., Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir. 1970); United States v. Sheet Metal Workers, *supra* (8th Cir. 1969); United States v. Local 189, *supra* (5th Cir. 1969); Local 53 v. Vogler (5th Cir. 1969); see also Quarles v. Philip Morris, Inc., *supra*.

■ Here, the discriminatory practices were admitted and continued for over two years beyond the effective date of the Act. Under such circumstances, a court may alter by decree a seniority system which itself may be racially neutral on its face, even though the system developed without regard to racial considerations. Local 189 v. United States, *supra*. This is true irrespective of section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h) which exempts as unlawful employment practice different conditions of employment pursuant to a bona fide seniority system which is "not the result of an intention to discriminate because of race." Intention may be inferred from conduct considering all the surrounding circumstances. It is not necessary to prove that an intention *to discriminate* existed at the time of the conduct. To prove intention all that need be demonstrated is that the conduct is not accidental, inadvertent or heedless, or arises from mistake. Local 189, United Papermakers & Paperworkers v. United States, *supra*, 416 F.2d at 995 n. 15, cf. Dobbins v. Local 212, *supra*, and United States by Clark v. H. K. Porter Co., 296 F.Supp. 40 at 115 (N.D.Ala.1968). Also "bona fide" as used in the statute should not be read as exempting from adjustment a seniority system based on discriminatory practices where the proof shows a violation of the Act after its effective date and the seniority system perpetuates the effects of the discrimination. Such a system is not bona fide. Local 189 v. United States, *supra*, 416 F.2d at 988; Quarles v. Philip Morris, Inc., *supra*, 279 F.Supp. at 517. Here, the record is replete with facts from which the intention of the company can be inferred. The conduct of the union, including its failure to take steps to discourage company policy and its acquiescence in an historical and traditional discriminatory policy, belies the contention that its participation in the end result was accidental, inadvertent or unintentional. This court cannot believe that the union was unaware of a situation which was perfectly obvious to every Negro at the Bethlehem Plant.

■ Given this factual situation, it is clear that this court is fully empowered both by the statute itself (section 707(a), 42 U.S.C. § 2000e–6(a) which authorizes the Attorney General to request "such relief * * * as * * * necessary to insure the full enjoyment of the rights herein described") and by traditional principles of equity, cf. Mitchell v. DeMario Jewelry, 361 U.S. 288 at 291–292, 80 S.Ct. 332; 4 L.Ed.2d 323 (1960) and Porter v. Warner Co., 328 U.S. 395 at 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1956); see also United States by Clark v. H. K. Porter, *supra*, 296 F.Supp. at 115, to fashion a decree which will correct the present effects of past discrimination. Indeed, as stated by the Fourth Circuit, "In formulating relief from such practices the courts are not limited to simply parroting the Act's prohibitions but are permitted, if not required to 'order such affirmative action as may be appropriate.'" 407 F.2d 1047 at 1052; 42 U.S.C. § 2000e–5(g). However, in granting relief, the court must also anticipate collateral effects of a proposed decree to determine if such effects would create inequities so as to render the proposed relief inappropriate under the particular facts of the case. This court must now consider the relief requested by the Attorney General to determine if such relief should be granted under all the facts and circumstances.

## COLLATERAL EFFECTS OF REQUESTED RELIEF

The Attorney General asks this court to remedy the discriminatory assignment policy of Bethlehem Steel Corporation's Lackawanna Plant by allowing all Negroes (and only Negroes) employed in the eleven departments to transfer from those departments to other departments in the Plant with rate retention and without the loss of seniority privileges. While it may be true that this remedy would completely erase any vestige of past discrimination, the court is of the opinion that the remedy would be too drastic, would result in considerable inequities to the other plant employees, and would create an unwarranted preference for Negroes over whites in the eleven departments. While the proposal would certainly make transfer more attractive to employees than presently, the court believes that, among other things, the following inequities would result:

(1) The remedy benefits certain Negroes but not whites who are similarly situated. Although this court does not doubt its power in a proper case to provide a remedy exclusively for Negroes where they are the only members of the class discriminated against, the proof in this case indicates that Bethlehem Steel Company's discriminatory assignment policies related not alone to Negroes but also to ethnic minorities in general (Stip. 2, p. 3; Trial Transcript pp. 1144–1153, 1356, 1372–3 and 1585). Simply because the Attorney General has, for practical reasons, limited its case to Negroes, does not require the court to be so limited in providing relief. Indeed, to do so under these facts would be arbitrary, unfair and unwarranted under the evidence presented.

(2) Rate retention would result in different rates of pay for doing the same job. It would undermine the Job Classification Program in the industry and create broad exceptions to the "equal pay for equal work" doctrine which is the hallmark of the steel industry in this country. It is not improbable that employees receiving less than others doing the same work would demand that their rate be upgraded similarly. Rate retention would also result in some instances in the transferees receiving higher pay than the supervisors for whom they work, with the attendant adverse effect on morale and production. Additionally, where incentive jobs are involved, the transferee, since he may already receive a higher rate of pay, would have little or no motivation to increase production. Where the incentive is computed on a group basis, the group would suffer from the lack of motivation of its transferee members resulting in damage to morale throughout the Plant. Finally, under the proposal, there is no provision which would prevent senior employees in the eleven departments, who now hold highly-paid jobs of responsibility, from transferring to less responsible positions in other departments while receiving the same rate of pay. Considering all the evidence, the court believes that any decree containing rate retention provisions, under the circumstances of this case, would result in inequities at least as objectionable as those the court is attempting to correct.

(3) The government's proposed seniority carryover remedy would seriously disrupt employees' existing promotional and demotional aspects by changing the relative seniority standings of employees and enabling transferees to displace existing employees from their jobs. Thus, employees who are blameless would pay the price for the company's violations. The government acknowledges that its seniority carryover remedy would have these effects.

Throughout the history of the steel industry, employees have advanced up through their seniority units on the basis of their relative seniority within their department or unit. As promotional opportunities arise, the qualified employee with the greatest departmental or unit seniority is the one who is entitled to the promotion. Employees who transfer from another department begin accumulating departmental and unit seniority from the time they enter the new de-

partment; their seniority accumulated in their former department does not count in determining their relative standing for promotional purposes. The same is true when a reduction in force occurs.

The departmental and unit seniority system developed out of a desire that employees at all times know where they stand in terms of their future prospects in the department in which they work, and to enable employees to make decisions relating to their future with knowledge of their relative standing. The government's proposed carryover remedy would alter the relative standings of employees in their units in the following ways:

(a) Although under the government's proposal employees would initially go to vacant jobs at the bottom of the seniority unit and their entry into the department would not be at the expense of employees already in that unit, once in the new unit, the transferee would be credited for all subsequent moves with his full plant-wide service. The effect of this process would be to disrupt what would have previously been the firm expectation of employees already in the unit who had less plant-wide seniority than those transferred into the department. The same disruption would occur in reverse during a reduction in force.

(b) Many employees, both white and Negro, have transferred without the seniority carryover and if the government's proposed remedy were utilized, these transferees would occupy a seniority status inferior to those who transfer under the court's decree.

(c) The government's remedy would be made available to a limited group of people at the expense of others who are equally or worse situated, including the whites in eleven departments and the whites and Negroes in departments inferior to the eleven departments.

(d) Much credible evidence was introduced during the trial which indicated that the Negro employees of Bethlehem Steel Corporation, Lackawanna Plant, do not desire a special set of rights but only demand the ability to move and progress like everyone else in the Plant. As mentioned previously, the proof also indicates that transferring will take place without special incentives.

For all of the foregoing reasons, the court concludes that the seniority carryover remedy sought by the government in this case would be arbitrary in its application and effect, inequitable to employees guilty of no wrong, and would have adverse effects wholly out of proportion to the injustice which it seeks to cure.

### REMEDY

Consideration of all of the above collateral effects convinces this court that the relief proposed by the government contains provisions inappropriate and inequitable in curing a system which tends to lock Negroes and others into departments to which they were discriminatorily assigned. Moreover, the court believes that any relief designed to cure the present effects of discriminatory assignment must apply to all employees of the eleven departments irrespective of race, since the proof indicates that the discrimination was practiced against ethnic minorities in general. As of October 21, 1967, the proof indicates (Gov. Ex. 3) that there were 6227 employees in the eleven departments, 2160 of whom were Negroes. This court has found that transfers occur even when unaccompanied by the collateral benefits of rate retention and seniority carryover deemed necessary by the Attorney General. Transfer rights in order of Plant seniority, available to all employees in the eleven departments, without those benefits, will allow employees, who are today offended by the present effects of the discriminatory practices, the opportunity to avoid those effects. Because in exercising the option to transfer they will incidentally suffer temporary economic loss and must sacrifice accrued seniority in their present job, does not make the remedy ineffective. The choice will belong to the employees irrespective of race. If an individual deems it more advisable for him to stay where he is rather than suffer economic and seniority loss, he cannot complain thereafter

that he has not had a chance to change departments and avoid the present effect of the discriminatory practice. The things he will have to surrender have accrued to him without regard to race. All employees who elect to transfer will transfer under the same conditions without regard to race. The free choice is their own.

The court will order that all employees, both Negroes and whites, in the eleven departments as of October 1, 1967, shall have the right to transfer to other departments on the basis of seniority without rate retention or seniority carryover. As detailed above, the court also will order the relief requested regarding the Coke Ovens Department 512 and apprentice program and believes such relief is appropriate to cure the present effects of past discrimination. In addition to strengthening the transfer rights already in existence in the plant, the court will order that the company and union effectuate a substantial reduction in the number of pools, a remedy which will offer dramatic prospects of broadening transfer opportunities. The court believes that these steps will prove adequate to alleviate the present impact of the company's past policy of discriminatory assignments.

Enter decree accordingly.