**UNITED STATES of America, by Ramsey CLARK Acting Attorney General, Appellant,**

v.

**DILLON SUPPLY COMPANY, a corporation, Appellee.**

**No. 13975.**

United States Court of Appeals, Fourth Circuit.

Argued April 9, 1970.

Decided July 8, 1970.

---

Joel L. Selig, Atty., Dept. of Justice (Jerris Leonard, Asst. Atty. Gen., and David L. Rose, Atty., Dept. of Justice, on brief) for appellant.

W. P. Sandridge, Winston-Salem, N.C. (Womble, Carlyle, Sandridge & Rice, Winston-Salem, N.C., Charles H. Young and Young, Moore & Henderson, Raleigh, N.C., on brief) for appellee.

Before BOREMAN, WINTER and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

The Attorney General instituted this action under § 707(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. A. § 2000e–6(a), upon a recommendation of the Equal Employment Opportunity Commission referred to him pursuant to § 705(g) (6) of the Act, 42 U.S.C.A. § 2000e–4(f) (6). The government charged that the defendant, the Dillon Supply Company (hereafter "Dillon" or the "company"), was engaged in a pattern or practice of racial discrimination with respect to various employment opportunities in violation of §§ 703(a) (1), 703(a) (2), and 703(d) of the Act, 42 U.S.C.A. § 2000e–2(a) (1), (a) (2), (d).

The district court dismissed the action on the ground that the government had failed to establish any present violations of the Act. We conclude that because the district court's dismissal rested upon an erroneous interpretation of the Act, it must be reversed and the case remanded for further proceedings.

I

Dillon is a North Carolina company engaged in the business of selling, installing and servicing industrial equipment and supplies. At the company's Raleigh plant, upon which this litigation focused, the district judge found that there were on October 18, 1967, 68 white and 20 black employees. The complaint alleged that the black employees had initially been assigned on a racial basis to menial and low-paying jobs without regard to their qualifications and kept in these positions on account of their race by discriminatory promotion, transfer, and reassignment practices. The complaint also alleged that prior to the Act's effective date, the company had man-

aged substantially all of its facilities and operations on a racial basis. In addition, the government claimed that the company had failed to take adequate steps to rectify the present effects of its past policy and practice of racial discrimination.

In support of its allegations the government produced evidence which tended to show that the fabrication shop, fork lift department, steel warehouse and traffic department aspects of the Raleigh plant had long been racially identifiable as white and black. From July, 1965, the effective date of the Civil Rights Act, until January, 1967, there were no black welders or helpers in the fabrication shop. The fabrication shop's cleanup crew, on the other hand, was entirely black throughout this period and remained so on the date of the trial. From May, 1966, to March, 1969, there were never more than three white laborers in the steel warehouse. In December, 1964, there were nine black drivers and a white supervisor in the traffic department, and this situation existed as late as October, 1967. As of the date of the trial, May 23, 1969, the racial composition of the various departments was as follows:

| Department | White | Black |
|---|---|---|
| Traffic | 1 | 9 |
| Steel Warehouse Laborers | 2 | 11 |
| Fabrication Shop-Welders & Helpers | 30–40 | 3 |
| Fabrication Shop-Cleanup Crew | 0 | 6 |
| Fork Lift | 11 | 2 |

Thus, the government's evidence tended to show a pattern of assignments under which blacks were largely assigned to jobs as truck drivers, warehouse laborers or cleanup men while whites enjoyed the opportunity to become welders. Coupled with the statistical data, the government offered proof of a decentralized system of hiring and assignment which vested broad authority on the supervisors of largely segregated departments and which had no uniform or objective standards for hiring or assignment. The government also attempted to show that black employees who had been assigned to the traditional white departments were subjected to continued discrimination. Proof was offered of the lack of a formalized transfer system under which black persons employed or assigned on a racial basis could apply for and obtain more desirable positions in a traditionally white department. In addition, there was also evidence that after passage of the Act the company maintained segregated toilet and cafeteria facilities and had discriminated with respect to travel facilities. Finally, the government sought to demonstrate that the company's decentralized departmental hiring procedures and the absence of objective employment standards perpetuated and reinforced the racial identity of the various departments and thus preserved the effects of the past racial discrimination.

On the basis of these claims and the evidence presented to support them, the government sought a decree which would (1) enjoin future discrimination and the failure to take affirmative steps to correct the present effects of past discrimination; (2) require that new employees be assigned in such a way as to eliminate the racial identities of departments and jobs; (3) require the adoption of uniform, objective criteria and procedures for hiring, assignment, and promotion and disapproving the practice of decentralized hiring in the context of a racially segregated plant; (4) require the establishment of a central office for hiring and assignment, with one officer responsible for filling vacancies in con-

sultation with department heads; and (5) provide present black employees the opportunity to transfer to predominantly white jobs in the fabrication shop as vacancies occur without loss of seniority or other accumulated benefits.

The legal theory under which the district court evaluated the government's case was articulated in its pretrial orders and throughout the trial:

> [T]he Court is going to limit * * * questions * * * to violations which now exist. If the violations charged in this suit, which was filed in 1967, have already been eliminated, then there's no necessity of this proceedings [sic],—the issue has become moot. * * *

Under this theory the district court excluded evidence of events which had not occurred at the time of trial or immediately prior thereto because only present events were considered relevant to a determination of violations which "now exist." Thus, the court excluded evidence of the existence of segregated toilet facilities as late as July, 1967, two years after the effective date of Title VII but also almost two years before the date of the trial, for the reason that this situation no longer existed. It also excluded evidence which tended to establish that the company had discriminated in the hiring of a welder in June, 1968. Evidence that all new drivers in the traffic department hired since 1950 were black was also excluded.

The district court also apparently construed Title VII to require "specific acts" of overt discrimination. Thus, in one of the pretrial orders the government was directed to prepare and file a statement setting forth, *inter alia*, (a) each *specific* violation claimed *now* to exist, (b) the names of the persons discriminated against, the names of those preferred and the nature and acts of discrimination, (c) the names of those discriminated against and those preferred in regard to job assignments, employment, transfers or refusal to transfer together with the dates of the event complained of, the qualifications of the indi-

viduals concerned and the specific facts related thereto, and (d) a full statement, names of persons involved, dates, qualifications and other facts concerning any discrimination now existing or carried on.

This restrictive view of the Act led the district court to exclude certain evidence on the ground that the government had failed to specify in its pretrial summaries any "specific act" of discrimination to which the offered evidence related. Thus, the court excluded evidence of rates of pay and overtime opportunities on the ground that these matters had not been contained in the government's pretrial specification of violations.

## II

We think that the district court's interpretation of Title VII was too restrictive to fulfill Congress's purpose in enacting that legislation. Section 703(a) (2) of the Act makes it unlawful for an employer

> to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

In Griggs v. Duke Power Co., 420 F. 2d 1225 (4 Cir. 1970), we held that § 703(a) (2), as well as the rest of Title VII, provides a remedy for the present and continuing effects of past racial discrimination. *E.g.*, Local 53 of International Association of Heat & Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047, 1052 (5 Cir. 1969). As Circuit Judge Butzner said in Quarles v. Philip Morris, Inc., 279 F.Supp. 505, 516 (E.D.Va.1968):

> Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the act.

*Griggs* also held that policies and practices which were racially neutral on their face were, nevertheless, unlawful if

**804**

they tended to perpetuate the effects of past discrimination. *E.g.*, Local 189, United Papermakers and Paperworkers, A.F.L.–C.I.O., C.L.C. v. United States, 416 F.2d 980, 988 (5 Cir. 1969); United States v. Sheet Metal Workers International Association, Local Union No. 36, A.F.L.–C.I.O., 416 F.2d 123, 129–131 (8 Cir. 1969).

The district court was, therefore, in error in limiting Title VII to present specific acts of racial discrimination. It should have considered any past specific or general act, practice, policy or pattern of racial discrimination which the proof showed had any present discriminatory effect. Practices, policies or patterns, even though neutral on their face, may operate to segregate and classify on the basis of race at least as effectively as overt racial discrimination. Particularly is this so if a history of past discrimination is developed. In addition, the district court's restrictive interpretation of the Act appears to have been responsible for its decision to exclude the evidence related to pay rates and overtime opportunities on the ground that the government had not adequately specified these claims in its pretrial submissions. We think that an examination of this matter from the perspective of our interpretation of Title VII leads to the conclusion that the government indicated with sufficient clarity that it hoped to show that one of the present effects of past discrimination was a concentration of black employees in "low-paying" jobs.

### III

The government has urged us to remand with directions to enter specific injunctive relief. After careful consideration we have concluded to deny this request. The fashioning of effective and appropriate injunctive relief depends in part on the discretion of the district court. The function of the courts of appeal is to review the relief which the district court grants in light of findings and the supporting record and to determine if there has been an abuse of discretion. Here, the district court's erroneous view of Title VII led it to terminate its inquiry and function prior to an examination of the matters which we consider pertinent. Its initial evaluation under a correct interpretation of the Act, of what relief should be granted, has yet to be made.

This record does, however, amply demonstrate that at least in the past the company engaged in policies and practices which were racially discriminatory and in violation of the Act and that steps to eradicate all past discriminations have not been taken. Unquestionably, the granting of some relief is indicated, but the scope of full relief cannot be determined without admitting the evidence which was improperly excluded and reappraising all of the evidence in light of this opinion. Present policies and practices which are discriminatory or which, no matter how neutral in appearance, perpetuate the effects of past discrimination are unlawful and should be immediately enjoined. To the extent that the district court finds present effects of past discrimination, it should also promptly formulate effective affirmative injunctive relief.

Reversed and remanded.