**Arthur Ray PARHAM, Appellant,**

v.

**SOUTHWESTERN BELL TELEPHONE CO., Appellee.**

**No. 19969.**

United States Court of Appeals, Eighth Circuit.

Oct. 28, 1970.

---

Gabrielle K. McDonald, Houston, Tex., for appellant.

Donald K. King, Little Rock, Ark., for appellee.

Before VOGEL, LAY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

Following rejection of his application for employment and exhaustion of administrative remedies, Arthur Ray Parham commenced this suit under Title VII of the Civil Rights Act of 1964, 42 U.S. C.A. § 2000e, et seq., against Southwestern Bell Telephone Company (the Company) seeking relief individually and on behalf of blacks as a class from the defendant's alleged racially discriminatory employment practices in Arkansas, particularly in the City of Little Rock.[1] The district court, in a comprehensive unreported opinion, rejected Parham's claims for a money judgment on his own behalf and injunctive relief for the class as authorized by 42 U.S.C.A. § 2000e–5(g). Parham appeals from a judgment of dismissal.

The record shows little dispute upon the essential facts. On February 8, 1967, Parham, an eighteen-year-old black youth, applied for employment with the Company as a stockman. The record dis-

---

1. Pursuant to Rule 23 of the Federal Rules of Civil Procedure.

closes that Parham favorably impressed the Company's employment manager upon his initial personal interview. The employment manager informed Parham that no openings existed for stockmen, but that the Company needed linemen. Parham expressed an interest in the position and underwent certain preemployment testing. He passed the Company's aptitude tests as well as a physical examination.

In checking with Parham's previous employers, however, the Company learned that Arkansas Baptist Hospital in Little Rock had discharged Parham as an orderly after working from August 8, 1966, until November 21, 1966. An employee in the Baptist Hospital personnel section characterized Parham's conduct as insubordinate, neglectful of duty, frequently absent without reason or notice and requiring constant supervision. An inquiry with the Chicago Magnet Wire Corporation in Chicago, Illinois, revealed that Parham's employment there in the summer of 1966 had been terminated when he failed to report for work after two weeks on the job. The Company also learned, in checking the applicant's record at Central High School in Little Rock, that he had graduated in June, 1966, in the lowest one-fifth of his class. Following receipt of this adverse information, the Company by letter dated February 17, 1967, rejected Parham's application, saying: "After investigating your school record and your work history, we feel that you do not have the qualifications needed for employment."

Parham, on April 6, 1967, filed a complaint with the Equal Employment Opportunity Commission (EEOC), pursuant to 42 U.S.C.A. § 2000e–5, charging the Company with racial discrimination in refusing him employment. Upon investigation, the EEOC found reasonable cause to believe that the Company had been guilty of a discriminatory employment practice.[2] The EEOC then attempted to resolve the dispute through conciliation pursuant to 42 U.S.C.A. § 2000e–5(a), and requested the Company to sign a conciliation agreement. On November 7, 1967, the Company offered Parham a position as a lineman. Parham, then a college student, declined. The Company, thereafter, refused to execute any conciliation agreement with the EEOC, contending that Parham's refusal to accept the offer of employment rendered the dispute moot, leaving nothing to conciliate. The EEOC then notified Parham of his privilege to prosecute an action in the federal district court, 42 U.S.C.A. § 2000e–5(e). Plaintiff Parham filed his complaint on April 25, 1968.

On this appeal, Parham raises four contentions, each of which was rejected by the trial court: (1) the Company's employment practices have discriminated against blacks generally and Parham in particular in violation of Title VII of the Civil Rights Act of 1964; (2) the Company's policy and practices of securing new employees through recommendation and recruitment by existing workers and acceptance of walk-in applicants have discriminated against blacks; (3) the Company's specific requirement that applicants for employment, except common laborers, possess a high school diploma or its equivalent has discriminated against blacks; and (4) the facts presented to the trial court entitled Parham to damages for lost wages as a lineman and injunctive relief for blacks as a class.

Although appellee's rejection of Parham's application for employment served as the basis for instituting this lawsuit, the allegations that the Com-

2. The EEOC's decision, dated September 27, 1967, said:
   "Reasonable cause exists to believe that Respondent is in violation of Section 703 (a) (1) of Title VII of the Civil Rights Act of 1964 by not hiring Charging Party, a Negro, solely because of a poor reference that was not really indicative of his potential at a Company job, although he fulfilled all other requirements for employment; and in addition, no Negro males are employed by Respondent except as service workers."

pany discriminated in employment against all blacks rested upon the Company's record of having hired relatively few blacks, and those as janitors or common laborers. Section 703(a) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(a), prohibits employers subject to Title VII from discriminating against employees and applicants for employment on the basis of "race, color, religion, sex or national origin." With this background, we turn to a review of the Company's recent history of employing blacks in Arkansas.

In April of 1964, appellee's management issued a statement of policy repudiating race, creed, color or nationality as a factor in employment, proclaiming that "all applicants for employment are considered and hired only on the basis of merit * * *." The Company's Arkansas employment statistics on September 30 of that year showed only 51 black employees, most with lengthy tenure, out of a total work force of 2,736 persons. Forty-six of those black employees worked in "house service" as janitors, cleaning ladies or laborers, with the remaining five employed in the "operatives" category as coin collectors or stockmen. At that time, no blacks worked in the other four employee categories of sales, technicians (draftswomen), office and clerical (including telephone operators), or skilled craftsmen. These statistics serve only as a basis for comparison since Title VII did not take effect until July 2, 1965. Neither the announcement of the Company's equal-employment-opportunity policy nor the enactment of Title VII served to produce any noticeable increase in the number of blacks employed from April, 1964, to December 31, 1966. As of June 30, 1966, the Company had employed only three more blacks than those employed two years earlier, although the Company's total work force had grown to 3,163. In fact, the proportion of non-white employees had decreased from 1.86 per cent in September, 1964, to 1.71 per cent in June of 1966. Of these 54 black employees, six women had obtained positions in the office and clerical section, four of them becoming telephone operators. Most of the blacks, however, remained in the house service category (42), with the remaining six working as operatives. By December 31, 1966, just five weeks prior to Parham's application for employment, the Company's total number of employees had dropped to 3,074, with blacks now numbering 56, or 1.82 per cent of the work force. No blacks worked as craftsmen, draftswomen, or in sales.

Parham introduced these employment statistics at trial in support of his allegations of racial discrimination by the Company. He also introduced testimony from several black individuals, male and female, who had unsuccessfully sought employment as skilled workers with the Company. Further evidence established that at the time appellant sought employment, the Company secured most of its employees through recruitment and recommendation by those persons then employed with the appellee. The procedure for gaining employment with the Company required, then as now, that applicants, except common laborers, possess a high school diploma or its equivalent.[3] The applicants then took certain standardized tests which measured their aptitudes and educational levels. Following successful completion of these tests and a physical examination, the Company investigated the applicant's references and work history.

The Company's successful defense at trial consisted primarily of rebuttal evidence showing that it had adopted an affirmative action program in late 1968, which resulted in increased hiring of blacks. This program called for active recruitment of minority group members through employment agencies, civil rights organizations and educational in-

---

3. Acceptable substitutes included a certificate from the armed forces or from the State of Arkansas acknowledging that the individual had passed the General Educational Development Test.

stitutions. In addition, the program sought to achieve complete integration of the Company's work force in all departments as well as the plant work, rest and recreational areas. The plan included the establishment of job training and community training courses to elevate the skill level of some minority group individuals. At the trial, the Company emphasized a comparison of more recent employment statistics with those of earlier years which reflected the success of this program. The number of black employees over a two-year period had increased from 54 as of June 30, 1966, to 144 (approximately 4.5 per cent of the total) on June 30, 1968. In 1967, 6.1 per cent of the Company's new employees were blacks. This figure increased markedly to 17.6 per cent, or 135 blacks of 766 new employees, in 1968. The statistics as of June 30, 1968, also demonstrated that blacks had penetrated the more skilled employee categories; ten persons serving as clerks or stenographers; 61 telephone operators; one service representative; 29 skilled craftsmen; seven operatives; and 36 remained in house service,

As additional evidence of its good faith efforts to provide equal employment opportunities, the appellee established that in 1967 and 1968 it enrolled black high school graduates in a special training program to enable them to qualify for more jobs in the skilled categories. Of the ten trainees enrolled in this program in 1967, the Company offered five of them jobs and one accepted. The Company offered jobs to eight of the eleven trainees in 1968; four accepted. Company personnel further testified that the appellee intended to continue these affirmative action programs. To rebut testimony from specific black applicants for employment introduced by Parham, the Company produced evidence tending to show valid business reasons supporting its refusal to hire each of them.

The trial court recognized that the Company's extremely small number of black employees through 1966 reflected a disinclination by Arkansas employees to implement the Company's announced policy of equal employment opportunities, noting in its opinion that, "to that extent the situation was probably discriminatory." The court, however, denied Parham any relief, finding:

> \* \* \* that a preponderance of the evidence does not sustain plaintiff's claim that defendant is now discriminating against Negroes as a class or that he [Parham] personally was a victim of any racial discrimination.

■ Initially, we examine the class action contention that appellee has pursued a policy of employment discrimination against blacks in general. Discrimination, or conversely fairness, in general hiring practices often indicates whether an employer has discriminated against a particular applicant for employment. Furthermore, a single charge of employment discrimination under Title VII found by the EEOC to rest upon reasonable grounds may serve to launch a full-scale inquiry into the alleged unlawful motivation in employment practices. Jenkins v. United Gas Corporation, 400 F.2d 28, 33 (5th Cir. 1968). In examining a claim for relief under Title VII, a court's inquiry must focus upon those employment practices which gave rise to the particular complaint. The crucial issue in a lawsuit of this kind is whether the plaintiff establishes hiring bias at the time of his rejection for employment and subsequent complaint to the EEOC, not the employment practices utilized two years later. See United States v. International Brotherhood of Electrical Workers, Local 38, 428 F.2d 144 (6th Cir. 1970); Jenkins, supra, 400 F.2d 28; United States v. Plumbers Local 73, 314 F.Supp. 160 (S.D.Ind.1969). Title VII of the Civil Rights Act of 1964 is to be accorded a liberal construction in order to carry out the purpose of Congress to eliminate the inconvenience, unfairness and humiliation of racial discrimination. United States v. Medical Society of South Carolina, 298 F.Supp. 145 (D.S.C. 1969).

In cases concerning racial discrimination, "statistics often tell much and Courts listen." State of Alabama v. United States, 304 F.2d 583, 586 (5th Cir.), aff'd per curiam, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962); see Penn v. Stumpf, 308 F.Supp. 1238, 1243 (N.D.Cal.1970); Dobbins v. Local 212, Int'l Bhd. of Electrical Workers, 292 F.Supp. 413, 417 (S.D.Ohio 1968). The statistical evidence introduced by Parham clearly demonstrated the Company's discriminatory employment practices from July 2, 1965, until February, 1967, notwithstanding its previously-announced policy of equal employment opportunities. The trial court commented on the disparity between the 1964 Company policy announcement and the actual implementation of equal-employment policies, saying:

> While the statement was issued, and while the Court will accept it as a sincere statement of management's policy, the Court must say that it was not vigorously implemented for a time and did not of itself produce any significant increase in the number of Negroes employed by the company.

■ We hold as a matter of law that these statistics, which revealed an extraordinarily small number of black employees, except for the most part as menial laborers,[4] established a violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C.A. § 2000e–2(a). See United States v. Sheet Metal Workers Local 36, AFL-CIO, 416 F.2d 123 (8th Cir. 1969); Local 189, United Papermakers and Paperworkers, AFL-CIO v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); Plumbers Local 73, supra, 314 F.Supp. 160; Clark v. American Marine Corporation, 304 F.Supp. 603 (E.D.La.1969); Lea v. Cone Mills Corporation, 301 F. Supp. 97 (M.D.N.C.1969); Medical Society of South Carolina, supra, 298 F.

Supp. 145; Dobbins, supra, 292 F.Supp. 413. The trial court erred in completely absolving the Company of unlawful employment practices on the basis of changes in the appellee's recruitment practices and increased hiring of blacks subsequent to the institution of this lawsuit. While an employer's more recent employment practices may bear upon the remedy sought, they do not affect the determination of whether the employer previously violated Title VII.

Here, the Company's subsequent offer of employment to Parham and its minority group recruitment programs instituted subsequent to February of 1967, however laudable and sucessful, cannot alter the fact that racial discrimination against blacks as a class existed well after July 2, 1965, the effective date of Title VII. The situation in the instant case is analogous to that in Jenkins, supra, 400 F.2d 28, where a black employee instituted an action under Title VII alleging racial discrimination in the employer's promotion policies. The employer reversed its position and offered the suing employee the promotion, which he accepted. The employer then obtained a dismissal of the district court action on grounds that acceptance of the promotion had rendered the action moot. The Fifth Circuit reversed, however, rejecting such "resist-and-withdraw" tactics as a means of obtaining dismissal of the lawsuit. Speaking for the court, Chief Judge Brown declared that voluntary cessation of the allegedly illegal activity did not make the case moot, noting that "[s]uch actions in the face of litigation are equivocal in purpose, motive and permanence." 400 F.2d at 33. See also Local 53 of Int'l Ass'n of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047, 1055 (5th Cir. 1969).

Appellant also contends that the Company's recruitment policy in February, 1967, and prior thereto, which depended

---

4. This court takes judicial notice of the fact that 21.9 per cent of Arkansas' 1960 population of 1,786,272 were blacks. City and County Data Book, United States Census of Population, Department of Census, pp. 22, 34 (1962). See Plumbers Local 73, supra, 314 F.Supp. at 161.

primarily upon existing employees to refer new prospects for employment, operated to discriminate against blacks. The validity of Parham's contention is borne out by the Company's employment statistics at that time. With an almost completely white work force, it is hardly surprising that such a system of recruitment produced few, if any, black applicants. As might be expected, existing white employees tended to recommend their own relatives, friends and neighbors, who would likely be of the same race.[5]

Where Title VII has been violated, courts may prohibit or change policies which appear racially neutral on their face but build upon pre-Title VII bias that produces present discrimination. United States v. Dillon Supply Company, 429 F.2d 800 (4th Cir. 1970); Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir.), cert. granted, 399 U.S. 926, 90 S.Ct. 2238, 26 L.Ed.2d 791 (1970); Sheet Metal Workers Local 36, supra, 416 F.2d 123; Local 189, Papermakers and Paperworkers, supra, 416 F.2d 980; Vogler, supra, 407 F.2d 1047; United States v. Bethlehem Steel Corp., 312 F.Supp. 977, 992 (W.D.N.Y. 1970); Quarles v. Philip Morris, Incorporated, 279 F.Supp. 505 (E.D.Va. 1968). In Sheet Metal Workers, Local 36, supra, 416 F.2d 123, Judge Heaney, speaking for this court, said:

> In our view, neither Local can be permitted to continue to operate its employment referral systems without change. Both plans effectively operate to deprive qualified Negroes of an equal opportunity for employment as journeymen electricians or as sheet metal workers. Because the plans carry forward the effects of former discriminatory practices, they result in present and future discrimination and are violative of Title VII of the Act. 416 F.2d at 131 (footnote omitted.)

Federal regulations implementing the equal employment opportunity requirements of governmental contracts recognize the discriminatory effects of such apparently neutral referral-type recruitment practices. The regulations require that:

> Contractors should employ procedures for handling of applicants that are compatible with equal employment opportunity. In this regard, employee referrals or "walk-ins" require particular attention, since these recruitment procedures are most susceptible to discrimination. Employees tend to refer friends from their own racial and ethnic backgrounds and, therefore, if few minority group workers are already employed, few minority group workers are likely to be referred. With regard to "walk-ins", the entire recruitment program is strongly dependent upon the attitudes of guards and receptionists and can thus be easily frustrated. 41 C.F.R. § 5–12.805–51 (b) (5) (1970).

Applying the rationale of the cases and the government regulation, we determine as a matter of law that the Company's system of recruiting new workers in February of 1967 operated to discriminate against blacks. The Company however, has initiated substantial changes in its recruitment procedures since that time and these changes affect the remedy to be fashioned in this case.

Appellant further contends that the Company's requirement of a high school diploma, or its equivalent, discriminated against black applicants for employment because a smaller proportion of blacks than whites graduate from high school. We note that Parham suffered no discriminatory effects from this requirement since he possessed a high school diploma. The record contains insufficient data for us to rule that this requirement operated with discriminatory

---

5. The trial court, in commenting on the referral recruitment system, observed that: " * * * employment in the 'all white' categories, would continue to be all white, and employment in the predominantly lower Negro categories would continue to be predominantly Negro."

effect upon black applicants for employment.

■ We turn next to a consideration of Parham's allegation that the Company rejected his application for employment on account of his race. Although the Company's discrimination in employment against blacks prior to February, 1967, furnishes a strong inference that Parham was rejected for employment because of racial considerations, such a presumption is not conclusive. The trial court, upon all the evidence, determined that the Company refused to hire Parham because of the poor recommendation it had received from a previous employer, rather than on account of his race. Although the recommendation may have unfairly penalized the applicant,[6] it did adversely reflect upon Parham's dependability as a future employee. Nothing in the record indicates that the appellee's background investigation of Parham was anything other than a good faith effort to explore his prior employment experience. The trial court's conclusion on this issue, supported by the record, is not "clearly erroneous", and we sustain that finding. Fed.R.Civ.P. 52(a). Accordingly, we reject Parham's claim for back pay.

■ Parham's failure to establish his claim for individual damages will not bar relief for the class he represents. The very nature of a Title VII violation rests upon discrimination against a class characteristic, i. e., race, religion, sex or national origin. Bowe v. Colgate-Palmolive Company, 416 F.2d 711, 719 (5th Cir. 1969). In *Jenkins, supra,* 400 F.2d 28, the fact that an employer had settled an individual discrimination dispute with the suing employee did not bar the continuance of the action on behalf of the class. Similarly, the success or failure of the plaintiff's individual claim in this litigation need not determine the availability of relief to rectify the employer's class discrimination. In Hutchings v. United States Industries, Inc., 428 F.2d 303, 311 (5th Cir. 1970), the court noted that:

> * * * [O]nce the judicial machinery has been set in train, the proceeding takes on a public character in which remedies are devised to vindicate the policies of the [1964 Civil Rights] Act, not merely to afford private relief to the employee.

See also *Bowe, supra,* 416 F.2d 711; Oatis v. Crown Zellerbach Corporation, 398 F.2d 496 (5th Cir. 1968); Diaz v. Pan American World Airways, Inc., 311 F.Supp. 559 (S.D.Fla.1970). Since Parham's unsuccessful attempt to obtain individual relief serves as no bar to class relief, we now turn to a consideration of an appropriate remedy for the Title VII violation.

### REMEDY

In determining an appropriate remedy for the class action, we note that once a violation of Title VII has been found, courts possess wide discretion in modeling decrees to insure compliance with the 1964 Civil Rights Act. *Hutchings, supra,* 428 F.2d 303; *Sheet Metal Workers, Local 36, supra,* 416 F.2d 123; *Vogler, supra,* 407 F.2d 1047; *Medical Society of South Carolina, supra,* 298 F. Supp. 145. In the exercise of that discretion, courts have devised various remedies for Title VII violations. *Electrical Workers Local 38, supra,* 428 F.2d 144 (case remanded to district court with directions to retain jurisdiction and determine appropriate affirmative

---

6. The EEOC report which found reasonable cause to believe Parham had been discriminated against on account of his race questioned the objectivity of the recommendation from the hospital personnel office, noting that it may have reflected racial bias. The record in this case shows Parham to be a young man possessed of considerable intellectual capability and sincerity. Following his rejection for employment, Parham spent the summer working with native young people in villages near the Arctic Circle on a program sponsored by United Methodist. In the fall, he enrolled at Philander Smith College in Little Rock to study for the ministry, and there maintained a good scholastic record.

relief); *Sheet Metal Workers, Local 36, supra,* 416 F.2d 123 (locals ordered to modify employment-referral systems and undertake effective public information programs); United States v. Hayes International Corporation, 415 F.2d 1038 (5th Cir. 1969) (preliminary injunction granted); *Plumbers Local 73, supra,* 314 F.Supp. 160 (union's apprenticeship program revised, court retaining continued jurisdiction to insure compliance); *Bethlehem Steel Corporation, supra,* 312 F.Supp. 977 (extensive plan for ending discriminatory seniority rights adopted).

■ Appellant here seeks injunctive relief to enjoin the Company from unlawful employment discrimination under Title VII. 42 U.S.C.A. § 2000e–5(g). The trial court denied the request for an injunction, relying upon the evidence discussed above, which demonstrated the Company's good faith efforts, beginning in the middle of 1967 and continuing thereafter, to recruit black employees. The district court pointed to the increased number of blacks hired, the institution of programs and courses designed to assist blacks in overcoming educational disadvantages, and the Company's publicizing of its equal employment opportunity policy. At oral argument, appellee's counsel stated that the Company continues to implement these programs with the result that on June 1, 1970, appellee had employed 284 blacks of a total work force of 3,895 (8.4 per cent). Moreover, 22.6 per cent (203 of 899) of new employees hired during the one year ending June 1, 1970, were blacks.

The Company's record over the past three years is impressive and salutory. This court recognizes that the appellee has shown considerable progress under its affirmative action program adopted in 1968. The thrust of this program, in seeking minority group individuals for employment, tends to overcome the discrimination built into the previous recruitment system. The record also shows that the Company's management personnel have undertaken greater supervision and implementation of its employment policies and programs.

In view of this evidence, we agree with the trial court that no injunction seems necessary or appropriate in this case at the present time. Title VII aims at securing voluntary compliance with the requirements for equal employment opportunities. In enacting the Civil Rights Act of 1964, Congress placed great emphasis on private settlement and the elimination of unfair practices without resorting to the court's injunctive powers. See 42 U.S.C.A. § 2000e–5; *Hutchings, supra,* 428 F.2d 303; Culpepper v. Reynolds Metal Company, 421 F.2d 888 (5th Cir. 1970); *Jenkins, supra,* 400 F.2d 28; Oatis v. Crown Zellerbach Corporation, 398 F.2d 496 (5th Cir. 1968); *Quarles, supra,* 279 F.Supp. 505.

We reiterate, however, our finding that the Company's recruitment policies and practices from July 2, 1965, until February of 1967, discriminated against blacks in violation of Title VII. 42 U.S.C.A. § 2000e–2(a). Therefore, we remand the case to the district court with directions to retain jurisdiction over the matter for a reasonable period of time to insure the continued implementation of the appellee's policy of equal employment opportunities. *Dillon Supply Company, supra,* 429 F.2d 800. While recognizing the Company's tremendous progress in the hiring of black employees, we also take cognizance of the fact that this progress followed, not preceded, Parham's complaint to the EEOC and his subsequent institution of this lawsuit. Such progress must not end with the cessation of this litigation. It is incumbent upon the appellee to insure that it policies of equal employment opportunity continue to be implemented and enforced by all Company personnel engaged in employee hiring and promotion.

■ Although we find no injunction warranted here, we believe Parham's lawsuit acted as a catalyst which prompted the appellee to take action implementing its own fair employment policies and seeking compliance with

the requirements of Title VII. In this sense, Parham performed a valuable public service in bringing this action. Having prevailed in his contentions of racial discrimination against blacks generally prior to February, 1967, Parham is entitled to reasonable attorney's fees, including services for this appeal, to be allowed by the district court as authorized by 42 U.S.C.A. § 2000e–5(k). See *Clark, supra,* 304 F.Supp. at 611; *Dobbins, supra,* 292 F.Supp. 413.

We remand this case for entry of judgment and proceedings consistent with this opinion.