**Hyland Lewis BARNETT, Plaintiff,**

**v.**

**W. T. GRANT COMPANY, a corporation, et al., Defendants.**

**No. C–C–72–64.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

March 8, 1974.

**328**

Julius LeVonne Chambers, Robert Belton and Jonathan P. Wallas, Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., for plaintiff.

James J. Baldwin and James M. Miles, Haynsworth, Baldwin & Miles, Greenville, S. C., for defendant W. T. Grant Co.

Francis M. Fletcher, Jr., Harkey, Faggart, Coira & Fletcher, Charlotte, N. C., and Hugh J. Beins, Bethesda, Md., for defendants Intern. Brotherhood of Teamsters, and Local 71, Intern. Brotherhood of Teamsters.

## MEMORANDUM OF DECISION AND ORDER

McMILLAN, *District Judge.*

### FINDINGS OF FACT

1. Plaintiff, Hyland Lewis Barnett, is a black citizen of the United States and the State of North Carolina, currently residing in Charlotte, Mecklenburg County, North Carolina.

2. Defendant, W. T. Grant Company (hereinafter referred to as the "Company" or "Grant") is a Delaware corporaiton domesticated in North Carolina and doing business in Mecklenburg County, North Carolina. Grant has more than twenty-five employees in Mecklenburg County and is engaged in the business of trucking, sales and distribution of goods in interstate commerce.

3. Grant is primarily engaged in the retail sale and marketing of goods. Grant's trucking operation is merely incidental to, and in support of, the retail operation. Since the trucking operation is incidental in character, Grant has few of the characteristics of a typical common carrier trucking company. Thus, Grant has no "pedal" or "city" drivers as do most such companies, and has no training programs to help employees acquire the skill and experience necessary to road drivers. Grant contracts its local or city delivery work to R–B Express, a local trucking company.

4. Defendant, International Brotherhood of Teamsters (hereinafter referred to as "IBT"), is an unincorporated labor organization engaged in an industry affecting commerce, has more than one hundred (100) members and exists in whole or in part for the purpose of dealing with Grant concerning grievances, labor disputes, wages, rates of pay, hours, and other terms and conditions of employment of some of the employees (including the plaintiff) of Grant located in Mecklenburg County, North Carolina.

5. Defendant, Local 71, International Brotherhood of Teamsters (hereinafter referred to as "Local 71"), is an unincorporated labor organization and an affiliate and agent of the IBT. Local 71 is engaged in an industry affecting commerce, has more than 100 members and exists in whole or in part for the purpose of dealing with Grant concerning grievances, labor disputes, wages, rates

of pay, hours, and other terms and conditions of employment of some of the employees (including the plaintiff) of Grant located in Mecklenburg County, North Carolina.

6. Plaintiff has exhausted his administrative remedies before the Equal Employment Opportunity Commission as required by Section 706 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5. This action is also properly brought pursuant to 42 U.S.C. § 1981 and 28 U.S.C. § 1343.

7. Grant's pertinent Mecklenburg County operations here involved are divided into two departments. The Fleet Operation, which is the basic long-line trucking operation and which includes truck drivers, office personnel, and supervisory and management personnel, commenced operation in April, 1966. The Consolidation Operation, which includes Grant's warehouse facilities, began regular operation in February, 1970.

8. Grant, IBT and Local 71 have negotiated separate collective bargaining agreements for the truck drivers in the Fleet Operation (the Fleet or Dispatch agreement effective 12/21/69 to 12/16/72), and for the warehousemen in the Consolidation Operation (the Consolidation agreement effective 12/21/69 through 12/16/72). There are no transfers allowed from jobs under the Consolidation agreement to jobs under the Fleet agreement or vice-versa. An employee desiring to move from one operation to the other would have to resign his job and become a new employee in the operation to which he transfers. Moreover, the transferring employee would lose all seniority rights. Wyatt Smith testified that he knew of no reason why carryover seniority would not be feasible.

9. The original complaint in this action was filed on April 6, 1972.

10. The racial composition of adults in Mecklenburg County, North Carolina, is approximately 75% white and 25% black.

11. As of April 1, 1972, Grant had never employed any black over-the-road truck drivers.

12. As of April 1, 1972, the racial composition of the non-supervisory employees of Grant by operation, department and job were as follows:

| FLEET OPERATION | WHITE | BLACK |
|---|---|---|
| Steno Clerk | 1 | 0 |
| General Clerk | 1 | 0 |
| Drivers | 27 | 0 |
| Security Guard | 2 | 0 |
| **CONSOLIDATION OPERATION** | | |
| **Claims Department** | | |
| General Clerk | 1 | 0 |
| Part-time Clerk | 1 | 0 |
| **Data Processing Department** | | |
| Lead Keypunch | 1 | 0 |
| Keypunch Operator | 2 | 0 |
| **General Office Department** | | |
| Secretary | 1 | 0 |
| Stenographer-Clerk | 1 | 0 |
| Receptionist | 1 | 0 |
| **Warehouse Department** | | |
| Receiving Clerk | 1 | 0 |
| Slic Clerk | 1 | 0 |
| Shipping Clerk | 1 | 0 |
| Warehousemen | 33 | 18 |
| Maintenance Mechanic | 1 | 0 |
| Porter | 1 | 0 |

13. Warehousemen are paid $3.00 per hour, which is as much as or more than all other consolidation employees earn except for two (receiving clerk and "slic" clerk). Barnett has worked not only as a warehouseman, but also occasionally as a clerk.

14. As of April 1, 1972, the racial composition of the supervisory work force of Grant by operation and department was as follows:

| | WHITE | BLACK |
|---|---|---|
| FLEET OPERATION | 3 | 0 |
| **CONSOLIDATION OPERATION** | | |
| Claims Department | 1 | 0 |
| Data Processing Department | 1 | 0 |
| General Office Department | 2 | 0 |
| Warehouse Department | 4 | 0 |

15. As of September 28, 1972, there had been little change in the racial com-

position of Grant's work force since April 1, 1972. As of September 28, 1972, and after the complaint had been filed, two black truck drivers had been hired and there were a total of over forty truck drivers employed by Grant. (At trial, Grant had forty-two drivers.) No blacks worked in any non-supervisory job at Grant as of September 28, 1972, other than those in the Warehouse Department and the two newly hired black drivers.

16. The first black supervisor at Grant was Elton Edwards. He was promoted to a supervisory position in the Warehouse Department in September, 1972. Prior to the employment of Edwards as a supervisor, another black had been recommended for a supervisory position but had not been hired as a supervisor. In the summer of 1971, however, a supervisory position was given to John Hunnicutt, a white employee, rather than to Edwards. In addition, Perry Hager, a white employee who had less seniority than Edwards, was hired from outside the Company and given a supervisory job in preference to Edwards.

17. The Company has no objective criteria for the hiring of supervisory personnel. The Company looks to the character, performance and attitude of an employee when considering him for a supervisory position. Normally, supervisors are chosen from the ranks of incumbent employees and applications for supervisory positions are not required.

18. The Company actively recruits employees for work in the Consolidation Department, utilizing *inter alia* newspapers and contacts with high school job counselors.

19. Drivers for the Company's Fleet Division are not actively recruited. New over-the-road truck drivers are obtained through the use of "walk-in" applicants, by direct referral through incumbent Company employees, and by "word of mouth."

20. From time to time, the Company places a sign stating "No Applications Taken at This Time," or words to that effect, on the main office door of the Grant facilities at Nevada Boulevard in Charlotte, North Carolina. Wyatt Smith, Grant's Fleet Manager, testified that the effect of such a sign would probably be to turn away some job applicants who wish to apply for driving jobs with the Company.

21. Only several blacks have apparently filed applications for driving positions with the Company. Grant's recruiting practices for drivers are such that new drivers are likely to learn of vacancies by "word of mouth" from incumbent white drivers. The Company's refusal to accept applications from time to time may present an additional barrier to blacks.

22. Delmar Wilson, white, and a witness for the Company, testified that he obtained a driving job when he heard about job vacancies at Grant from an incumbent Grant employee, Eugene Lambert, who is also white. Bernard Davis, white, a witness for the Company, and an incumbent driver for Grant, applied for his driving job at Grant pursuant to the oral suggestion of a friend.

23. In order to be eligible for employment in Grant's warehouse an applicant must be at least sixteen years old. Grant actively recruits applicants for employment in the consolidation division by use of newspaper ads and contacts with local high schools. Grant has, in the past, administered two written tests to applicants for employment in the consolidation division. However, these tests (a name finding test and a number perception test) were used solely as an aid to ascertaining where job applicants' interests lay, and no one has ever been denied a job because of scores made on these tests.

24. These tests were designed to measure skills needed for positions involving the warehousing and storing of freight for which applicants to the consolidation division were being hired. Grant stopped using these tests in July of 1972.

25. Yvonne Gary is a black female who applied for work as a clerk-typist in Grant's fleet division in January, 1972. She was given an application at Grant's facility and interviewed by Smith, who told her that he would let her know whether or not she had the job. Smith interviewed Gary and four white applicants because, at the time, Grant tentatively planned to create a new, full time general clerk's job in the fleet division. Neither Gary nor any of the four white applicants was offered the job because the Company decided against creating it. Instead, Smith hired a white female high school student to work part-time because there was not enough work to justify hiring a full time clerk. The student worked four hours per day while she worked for Grant.

26. The plaintiff, who was born October 27, 1950, began work with Grant as a warehouseman on August 17, 1970. Some time in September or October, 1970, the plaintiff began the job of refueling and hooking up tractor-trailers.

27. About October, 1970, the plaintiff became a switcher for Grant. His duties consisted of moving and parking trailers at the Grant facilities and taking trailers to various other terminals within Mecklenburg County.

28. Prior to October, 1970, the plaintiff had truck driving experience which included driving a truck on his father's farm and driving a tractor-trailer from the premises of a former employer, R–B Express, to Grant's terminal, a six to seven-mile trip. The plaintiff also had additional driving experience with Sepco Chemical Company.

29. While working as a switcher for Grant, the plaintiff made approximately thirty to thirty-five trips to the Johnson Motor Lines terminal located off Interstate 85 in Charlotte, North Carolina. These trips, which were twenty-five to thirty-five miles round trip, were made by the plaintiff with a full-sized but empty tractor and trailer, generally used by Grant's over-the-road drivers, along some of the busiest streets and highways (including Graham Street) in Mecklenburg County. Bernard Davis, a witness for the Company, described the traffic on Graham Street, stating "You don't want to get a truck on there unless you have to."

30. The plaintiff also made ten to fifteen trips to the trucking facility known as Transporter Pool which is located on North Graham Street in Charlotte, North Carolina, a distance of thirty-five miles or so round trip from the Grant terminal on Nevada Boulevard. These trips were made with a full-sized tractor-trailer unit on busy and congested streets and roads.

31. The plaintiff, prior to February, 1972, made five trips with Grant drivers in order to get the feel of truck driving and to gain driving and road experience. On several of the trips the plaintiff did no driving. On one trip, he drove from Albemarle, North Carolina, for a few miles toward Troy, North Carolina, and from Fayetteville, North Carolina, to Charlotte, North Carolina. The plaintiff made progress in his driving skills during these trips. These various trips were made with the permission of Wyatt Smith, Grant Fleet Manager.

32. The requirements for longline drivers imposed by the United States Department of Transportation are as follows: an over-the-road driver must be twenty-one years of age, must have a valid chauffeur's license in the state in which he is domiciled, must pass an Interstate Commerce Commission (ICC) physical examination, must pass the ICC road test, and must be able, by reason of experience or training, to safely operate the equipment to which he is assigned.

33. As of February, 1972, the plaintiff was twenty-one years old, had obtained a North Carolina chauffeur's license on November 5, 1971, had passed the ICC physical and road tests, and had the mechanical and technical ability to operate a tractor-trailer unit. Ralph Soots, a white man who was the plaintiff's supervisor when the plaintiff was a switcher, testified that there was no

question in his mind that the plaintiff had the ability to drive a tractor-trailer unit to Johnson Motor Lines and Transporter Pool. Soots, in fact, recommended Barnett for a driving job, and Barnett was so proficient a switcher, he taught others switching duties.

34. In addition to the requirements set forth above instituted by the Department of Transportation for over-the-road truck drivers, Grant requires that all truck drivers be at least twenty-three years of age, and have at least two years' driving experience. One white driver less than twenty-three years old was employed in 1972, but was discharged upon discovery that he had falsified his age in his application. This occurred subsequent to the institution of this suit. Smith testified that despite the guidelines, the plaintiff would have been given a full opportunity to drive if he had received a favorable report from Bernard Davis.

35. Department of Transportation Regulations specifically provide for the imposition by carriers of more stringent hiring qualifications, such as the age and experience requirements imposed by Grant. Grant's employment guidelines for road drivers described above have been in effect since 1967 and they have been consistently followed. No exceptions to the guidelines have ever been made and all road drivers hired by Grant have had at least two years' driving experience and have been at least twenty-three years of age.

36. Since Wyatt Smith came with the fleet division in February, 1967, only four blacks have applied for road driver jobs. Three of these four black applicants were offered jobs, and two of them accepted. The one unsuccessful black applicant was rejected for his failure to successfully complete the ICC road test.

37. The plaintiff, Barnett, began working for the Company as a warehouseman in August, 1970. In October of 1970, he began performing the duties of "switcher" in the warehouse and terminal yard; i.e., he moved and parked trailers in the yard using a truck cab called a switcher. Barnett became twenty-one years old on October 27, 1971.

38. Barnett discussed becoming an over-the-road driver with supervisors of Grant on several occasions. He first talked with supervisor Soots around October, 1971, about wanting to become a driver, and Soots said the idea sounded fine to him.

39. In January, 1972, Barnett asked Smith and Soots to help him become a road driver. A week later, Soots asked Smith to consider letting Barnett become a driver, and Smith said he would send for Barnett's personnel file to review it. Barnett also asked Smith some time in February of 1972 to let him transfer to road driver.

40. At the time the plaintiff made his transfer request, Grant employed about twenty-seven road drivers, none of whom were black. The trucking operation had begun only six years earlier in April, 1966. Prior to 1972, Grant's road driver contingent had steadily grown from six or seven in 1967 to the twenty-seven in 1972. Also at the time of Barnett's transfer request, he was the only black employee of Grant ever to request a road driver job, and only one black person had applied directly for a road driver job.

41. At the time Barnett requested the road driving job, he had just turned twenty-one and he had never received any formal training as a road driver. The only road driving experience he possessed was the relatively small amount he had acquired while performing his switching duties at Grant. Barnett had had two accidents while performing his switching duties in the terminal yard within a period of one year, concerning the last of which he had demonstrated an immature attitude when he was asked to explain it; i. e., Barnett explained that he was "angry and upset" with a fellow workman at the time. Barnett had, pursuant to special permission from Smith, accompanied

road drivers on three or four short runs to observe these drivers in over-the-road situations in the two months before his trial run. He drove on only one such occasion, when a road driver allowed Barnett to drive the tractor between Albemarle, North Carolina and Troy, North Carolina. Barnett, however, pulled over and stopped driving after a short while because he was admittedly nervous and upset and was "making a lot of mistakes." According to Barnett's own testimony, "The reasons (for pulling over) was I was making a lot of mistakes and (the driver) was trying to correct me and I felt nervous about the whole situation. . . ."

42. Around the first week of February, 1972, Barnett again asked Smith about becoming a road driver, and Smith said that in view of Barnett's limited driving experience, he felt Barnett would have difficulty becoming a driver. However, Smith did arrange for Barnett to take the Department of Transportation tests, which was the initial requirement he had to meet to be eligible to drive over the road.

43. After Barnett passed these tests, he again asked Smith for a chance to prove he could drive over the road. Smith pointed out that Barnett had had several accidents with equipment in the yard, and that one accident had occurred because Barnett was "angry and upset" over an incident between himself and another employee.

44. In spite of Barnett's age and apparent lack of maturity, the head of Grant's fleet operation, Wyatt Smith, agreed to Barnett's suggestion that he be given a chance to prove himself on a "trial run" the week of February 21 with an experienced white driver, Bernard Davis, who was chosen specifically by Barnett. Smith allowed this trial run because Barnett had already proven himself to be a good employee with a great desire to become a Grant road driver. Smith and Barnett agreed that if he performed satisfactorily on the trial run, he would be placed on probation as a driver for sixty days.

45. All drivers hired by Grant are automatically placed on probation for sixty days, during which time they may be discharged.

46. In order to preserve his switching job in the event his trial run was unsuccessful, Barnett arranged for Fred Baker to take over his job for one week, after which Barnett could reclaim it. Barnett told Baker that if he was placed on probation as a driver but failed to complete the probationary period, he would either return to work as a warehouseman, or quit working for Grant altogether, and in either case, that Baker could keep the switching job. Baker agreed to take over the switching job on these conditions, and Soots approved their agreement.

47. Theodore Marshall is a black switcher operator employed by Grant. Marshall started work with Grant in March of 1970. When Marshall first applied for work with Grant in March, 1970, Soots and Marshall discussed the job of road driver, but Marshall was not interested in a road driving job. This discussion resulted from Marshall's past performance as a part-time over-the-road driver for Grant. Marshall had had over ten years' over-the-road driving experience with various companies.

48. On Sunday, February 20, 1972, the day before the trial run, Marshall heard about Barnett's trial run set for the next day, and drove to Grant's terminal to dissuade Barnett from taking the trial run. Marshall told Barnett at the terminal that he felt Barnett was rushing matters, and that if he would wait for a while, Marshall would go to Smith on Barnett's behalf to help Barnett become a driver. Marshall said he felt, based on his own experience as a driver, that Barnett was not yet ready for a road driving job, and that he hoped to save Barnett from being embarrassed by failing to qualify on the trial run. [Marshall's testimony, though strained

in spots, is creditable. He was black and was shop steward of the Union on strike against Grant during the time of the trial. He was a friend of Barnett's. Barnett had taken time to visit Marshall once when the latter was in the hospital, and Marshall was fond enough of Barnett to make a special trip to Grant on February 20 to dissuade Barnett from taking the trial run because Marshall wanted to save Barnett the embarrassment of failure. When Barnett was terminated, it was Marshall who, as shop steward, spoke for Barnett during the incident that resulted in his termination.]

49. The next morning, Barnett approached Davis in the dispatch office and told him of the arrangement concerning the trial run, and that he, Barnett, had obtained permission to go with Davis that day on Davis' run to Philadelphia, Pennsylvania. Davis went to Smith's office to verify that Barnett had permission to go, and Smith told Davis that Barnett had selected him for the trial run. Smith explained the trial run agreement to Davis, who said he would make a fair and true report on Barnett's driving performance. Barnett said that he had selected Davis because he knew Davis was a fair man who would give an honest report.

50. That same day, Barnett began his trial run with Davis to Philadelphia. Davis let Barnett drive between Lexington, North Carolina and Baltimore, Maryland. Barnett exceeded the speed limit during this time, and when Davis spoke to him about it, Barnett ignored the warning. On one occasion, during the trip, according to Davis, Barnett attempted to pass a truck and cut back in too soon, forcing the other truck completely off the road. He also cut several cars short while passing. While Barnett was driving, Davis was usually awake.

51. After Davis and Barnett returned from Philadelphia, Davis told Wyatt Smith that he felt Barnett was not qualified to drive over the road in

view of the mistakes Barnett had made and the lack of experience he had demonstrated on the trip.

52. Based upon Barnett's age, lack of experience, attitude toward his most recent yard accident, and primarily the results of his trial run, Smith decided not to allow Barnett to become a road driver at that time.

53. Barnett took no more runs that week because of a death in his family.

54. On or about February 28, 1972, Grant's dispatcher telephoned Smith and reported that Barnett had been calling and inquiring about being dispatched as a road driver. Smith told the dispatcher that Barnett was not to be assigned any runs because he was not a driver.

55. On Wednesday, March 1, Smith telephoned Soots and told him Barnett's trial run had not been successful and that because of Barnett's attitude concerning his accident of February 11, and his lack of experience as an over-the-road driver, Smith would not allow Barnett to become a driver at that time.

56. That same day, Barnett came to Smith's office for the first time since before his trial run. Smith told him that Davis had reported that Barnett had performed poorly in his trial run, and that in view of his lack of experience, his lack of training with a tractor, his poor performance on the Philadelphia run, and his attitude concerning the switching accident in February, 1972, he, Smith, could not allow Barnett to become a driver at that time. Smith suggested that if Barnett wanted to pursue driving, he should get a job with a trucking company which had a training program so he could gain experience, and offered to help Barnett get such a job. Barnett thanked Smith and left the office.

57. Barnett also telephoned Soots that day, told Soots he had not qualified as a driver, and asked for permission to take the rest of the week off, to which Soots agreed. Barnett was then scheduled to report back to work on Monday, March 6. Although he failed to report

that day, and his absence was unexcused, he was not reprimanded or disqualified. However, instead of coming to work, Barnett telephoned Soots, saying that Barnett was sick, when he admittedly was not sick. He did report to work the next day.

58. Around two weeks after his trial run, Barnett and Davis talked in the yard at Grant's by the fuel pump. Davis told Barnett about his report to Smith that Barnett was not yet qualified to drive. Davis told Barnett that he hoped they would still be friends and that he would have made the same report if Barnett had been his own brother.

59. At the time the plaintiff requested the road driving job, only one other employee of Grant, Wilbur Drawdy, had made such a transfer request. Drawdy, a white employee, was turned down for lack of experience.

60. On March 6, 1972, Barnett filed a charge with the Equal Employment Opportunity Commission claiming that Smith had denied him the road driver's job on account of his race. Prior to any investigation by the EEOC of the matter, and on April 6, 1972, Barnett filed this suit. Suit was brought not only against Grant, but also against Teamsters Local No. 71 (and the International Union). The plaintiff's original complaint was then amended to allege a class action under Rule 23 of the Federal Rules of Civil Procedure.

61. The trip with Davis to Philadelphia was not the first trip of a sixtyday probationary period, but was a trial run (one of the several trips that might have been available during the first week if the first one had been satisfactory) to determine whether Barnett should be started on a sixty-day probationary period of driving duty. Barnett was not paid for the trip to Philadelphia.

62. There is some evidence that instead of being penalized because of his race, Barnett was given some special privileges not ordinarily extended. For example, after he became a switcher he was allowed to report to work late every afternoon so that he could maintain another job he had at the North Carolina National Bank. He also tried out for the road driver's job without having had two years, or even any appreciable amount of road driving experience, and he was given the try-out for the road driver's job in spite of the fact that he had barely reached the age of twenty-one, whereas the Company's own regulation required that road drivers be twenty-three years old or more.

63. A great deal of evidence was introduced about matters which took place after plaintiff was denied the road driving job. This related chiefly to two incidents:

(1) The Company's refusal to allow Barnett to reassume his old job as switcher because of his original agreement that Baker could have the switching job if Barnett did not return after a week. This dispute seems to have been resolved in Barnett's favor through Union grievance procedure.

(2) The circumstances of Barnett's discharge for alleged insubordination and failure to comply with a direct order in January of 1973. This question was still pending at the time of the trial. Although there is room for an inference that things were not made easy for Barnett after this suit was filed, there is no basis on which I can find that he was discharged or mistreated in these respects because of his race.

64. I find as a fact that the refusal of the defendant to transfer Barnett and promote him to the job of probationary road driver was not based upon racial grounds, but was based upon a reasonable business decision and judgment as to his lack of maturity, lack of experience, tender age, and not yet stable emotional outlook.

65. Apart from the statistical data and surrounding circumstances de-

scribed above, there is no evidence of a class or even a small group of people who have been subjected to employment discrimination because of race.

66. I find that in fact, black persons were not employed at any time pertinent to the case in proportion commensurate with the numbers of black drivers or black employees in the community at large. Since there is no evidence, other than the statistical data, to demonstrate intentional discrimination, and since there is no evidence of individuals in the would-be class who have been discriminated against on account of race, the problem of class action is difficult to resolve and may be so close in its technical nature that it has to be resolved on the basis of where the burden of proof lies.

67. There is evidence that since the suit was started, defendants have abandoned what may be described as a traditional or passive recruiting program, and have begun to take more aggressive steps to recruit black employees in the various departments of the enterprise. The suit may, therefore, have achieved its essential purpose which in such matters is usually to bring about change rather than exact retribution for past transgressions. If that be the result of the suit, well and good; but I do not view the conversion of the employer's methods to be evidence of prior discrimination against black workers as a class. If this finding has an infirmity, its infirmities are based upon the weakness of the evidence, because I am fully aware of the strong inferences that can be argued from the statistical data in the record.

### CONCLUSIONS OF LAW

1. The court has jurisdiction of this action pursuant to Section 706(f) of the 1964 Civil Rights Act [42 U.S.C. § 2000e–5(f)] and under the Civil Rights Act of 1866 [42 U.S.C. § 1981]. The defendant W. T. Grant Company is an employer engaged in an industry affecting commerce within the meaning of Section 701(b) of the Act [42 U.S.C. § 2000e(b)]. The defendant Unions are labor organizations engaged in an industry affecting commerce within the meaning of Section 701(d), (e) of the Act [42 U.S.C. § 2000e(d), (e)].

2. The plaintiff has complied with the necessary procedural requirements of Section 706 of the Civil Rights Act of 1964 [42 U.S.C. § 2000e–5].

■ 3. The only class which the plaintiff can appropriately represent under Rule 23(a) is that group of black persons who have unsuccessfully applied for or requested road driving jobs with the Company. In this case, such a class would consist of less than five persons and, therefore, fails to meet the numerosity requirement of Rule 23(a)(1). *Calhoun* v. *Riverside Research Institute*, 4 FEP Cases 1006 (S.D.N.Y.1972); *Tolbert* v. *Western Electric Co.*, 56 F.R. D. 108, 4 FEP Cases 1172 (N.D.Ga. 1972).

■ 4. In cases arising under 42 U. S.C. § 1981 and Title VII of the 1964 Civil Rights Act [42 U.S.C. § 2000e *et seq.*], the plaintiff bears the burden of proving his case by a preponderance of the evidence.

■ 5. The plaintiff has failed to meet his burden of proof regarding his allegation that the defendant Company refused to promote him to a road driver job on the basis of his race. The Company's decision not to promote him was based primarily upon his poor performance on a trial run which he took from Charlotte, North Carolina, to Philadelphia, Pennsylvania, during which he was evaluated by an experienced road driver; and secondarily upon his young age, lack of actual road driving experience, and attitude toward a recent accident he had had in the yard. It appears, therefore, that the decision not to promote the plaintiff was based upon objective, as opposed to subjective, factors which were not biased against him or other black persons.

■ 6. The minimum twenty-three (23)-year-old requirement and the mini-

mum two (2) years of road driving experience requirement imposed by Grant upon applicants for road driving jobs are not shown by the record in this case to exclude a disproportionately large ratio of black persons applying for such jobs. Indeed, as of the time of this trial, four black persons had applied for road driving jobs at Grant, only one was rejected, and his rejection was not based upon his failure to satisfy either of the above-mentioned requirements. There is, therefore, no burden on the defendant Company under *Griggs* v. *Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), to show that these hiring requirements for road driver applicants are job-related. Assuming, *arguendo*, that the Company had such a burden, its age and experience requirements would appear legitimately related to the job of road driver for which the requirements have been uniformly imposed. Grant's use of its age and experience requirements is not violative of the 1964 Civil Rights or of 42 U.S.C. § 1981.

7. The conclusion that the plaintiff has failed to establish his claim for individual relief would not bar relief for whatever appropriate class he represents. See, *Bowe* v. *Colgate Palmolive Co.*, 416 F.2d 711, 719 (7th Cir. 1969); *Parham* v. *Southwestern Bell Tel. Co.*, 433 F.2d 421, 428 (8th Cir. 1970); *Brown* v. *Gaston County Dyeing Machine Co.*, 457 F.2d 1377, 4 FEP Cases 514, 516 (4th Cir. 1972). As previously concluded, however, this action is not appropriate for treatment as a class action under Rule 23. Resolution of the plaintiff's class claims is, therefore, not required.

8. Although the statistical evidence may well support an inference that Grant had a policy of discriminating against black employees, I do not find from the facts that this was the case; although I follow the theory I do not conclude that it demonstrates the fact on this testimony.

9. The recent history of the Company shows an up-turn since the filing of the suit in the fortunes of black applicants and employees. I do not read this recent history as proving previous discrimination, although I would be less than realistic if I did not suspect the two events to be somehow inter-related.

A summary of these conclusions of fact and of law may best be the old British verdict of "Not proven."

## JUDGMENT

All claims for relief are denied, and the suit is dismissed; no costs will be assessed.